THE STATE v. SCHULZ.

1. **Criminal Law :** PHYSICIAN: RESPONSIBILITY FOR EFFECTS OF TREAT-
MENT. One assuming to act as a physician, who treats a patient in
good faith and to the best of his ability, is not criminally responsible for
the death of the patient, caused by the medicine he administers.

*Appeal from Des Moines District Court.*

THURSDAY, APRIL 7.

THE defendant was indicted for murder in the second de-
gree, committed, as is alleged, upon one Mary Rayer, whilst
pretending to cure her of some disease. The defendant was
convicted of manslaughter, fined $100, and sentenced to the
penitentiary for one year. He appeals.

*Bremmerman & Rhode*, for the appellant.

*J. F. McJunkin, Attorney General*, for the State.

DAY, J.—The only testimony which bears directly upon the
circumstances of the death of Mary Rayer, and the defendant's
connection with it, is that of the deceased's hus-
band and is as follows: "Mary died on the 26th
of May last; was taken sick two weeks before she
died. Called in Dr. Kuitham. Went to get Dr.
Schulz on 23d of May. Schulz said she was pretty badly
off; used his instrument all over her body. At about 12
o'clock, on Tuesday, he gave her something to loosen her
bowels, from the same vial he was using on her body. Gave
her eight drops; called it some kind of croton oil. She got
worse. Went for Dr. Schulz to tell him. He gave me some
drops and told me to give her fourteen drops; I did
not give her fourteen drops, I thought it was too much.
Schulz came out that night and stayed until nearly
two o'clock. On Wednesday morning I told him not to

*[margin note:]* 1. CRIMINAL LAW : physi-cian : respon-sibility for ef-fect of treat-ment.

call again. He answered that it would be better for him to go and see her. Mary died on Wednesday night." A *post mortem* examination was made. The examining physicians testify that they found no traces of poison. The defendant on his own behalf testified as follows: "Am a Baunscheidist, and practice medicine according to the books of Baunscheidt. Use an instrument and oleum Baunscheidtii in my practice. Was called on to treat Mrs. Mary Rayer. I treated Mrs. Rayer according to my system, with instrument and oleum Baunscheidtii. On Tuesday I gave her four drops of the oleum internally. She was getting better under my treatment. On Wednesday morning Mr. Ryan came to my house and told me I need not call that morning. I told him that she must have assistance, because her symptoms were very dangerous. He said that he had no other physician, and that he would come back to me. Do not know what the oleum Bauncheidtii is made of, it is a secret of the inventor. I could have helped her, I think, if my instructions had been followed, and if I had been allowed to go on with my treatment."

The defendant introduced twenty-three witnesses who testified that they employed defendant as a physician, that he treated them with instrument and his oleum Baunscheidtii, and administered the oil internally, and that they got better. The abstract contains no evidence of any bad results. The court instructed the jury as follows:

"12. An express intent to take life is not necessary to constitute the crime of murder under the statute law of this State, and if one holds himself out as a practising physician, or a specialist in the treatment of diseases, and through gross ignorance of the medicine he uses, and its composition and its reasonable effects upon the human system, administers an irritant or corrosive poison in such quantities as would ordinarily and reasonably produce death, and death ensues therefrom, he would be guilty of the crime of murder. In such case the law presumes malice, and ignorance would be

no excuse, nor would the fact, if such existed, that the intention was to cure. The gross ignorance in such cases creates the criminal intention.

"13. A party, whether he be a physician or a specialist, has no right to hold himself out to the public as competent to treat diseases, and induce the public to employ him, unless he knows what the medicine is he uses, and its reasonable effect upon the human system, and to do so, and administer internally poisonous medicines in sufficient quantities to ordinarily produce death, and death is produced thereby, he would be guilty of murder, and if the defendant in this case through gross ignorance of the medicine used, or its reasonable effect upon the deceased as she was at the time, caused her death by an overdose of poisonous medicine, he would be guilty as charged, but if he was not grossly ignorant of the medicine he used, if any, and its reasonable effect upon the system, and administered it for an honest purpose, but made a mistake, he would not be guilty of the crime charged against him and should be acquitted."

The defendant asked the court to instruct as follows: "To constitute manslaughter the killing must have been the consequence of some unlawful act, and if the prisoner acted with an honest intention and expectation of curing the deceased by his treatment, although death, unexpected by him, was the consequence, he was not guilty of manslaughter, and you must acquit him."

In our opinion the court erred in the instructions given, and in refusing to give the one asked. In 2 Bishop's Criminal Law, 4 Ed., S. 695, the law upon this subject is declared as follows: "From the relationship of physician and patient the death of the latter not unfrequently arises. On this subject the doctrine seemed to have been held that whenever one undertakes to cure another of disease, or to perform on him a surgical operation, he renders himself thereby liable to the criminal law, if he does not carry to his duty some degree of skill, though what degree may not be clear; consequently, if

the patient dies through his ill treatment, he is indictable for manslaughter. On the other hand a more humane doctrine is laid down, that, since it is lawful and commendable for one to cure another, if he undertakes this office in good faith, and adopts the treatment he deems best, he is not liable to be adjudged a felon, though the treatment should be erroneous, and, in the eyes of those who assume to know all about this subject, which in truth is understood by no mortal, grossly wrong, and though he is a person called, by those who deem themselves wise, grossly ignorant of medicine and surgery. The former doctrine seems to be the English one; and so in England a person, whether a licensed medical practitioner or not, who undertakes to deal with the life or health of people, is bound to have competent skill, or suffer criminally for the defect. Now, if a man thinks he has competent skill, and makes no misrepresentation to his patients concerning the amount or kind of medical education actually received by himself, he seems in reason to stand on exactly the foundation occupied by every person who honestly undertakes medical practice after full advantages so far as concerns his state of mind, and it is the mind to which we look in questions of legal guilt. Any person undertaking a cure, but being grossly careless and thus producing death, is for a different reason liable to a charge of manslaughter, whether he is a licensed practitioner or not." The case of *Commonwealth v. Thompson*, 6 Mass., 137, is a very interesting and instructive one upon this question. From the testimony in this case it appears that the defendant was a grossly ignorant quack. He had three remedies, which he called *coffee*, *well-my-gristle* and *ram-cats*. He persisted in administering emetics to his patient until he died, to all appearances from the effects of his treatment. In this case it was held that " if one assuming the character of a physician, through ignorance administer to his patient with an honest intention and expectation of a cure, but which causes the death of the patient, he is not guilty of felonious homicide."

The case of *Rice v. The State*, 8 Mo., 561, is much like the preceding. The defendant in that case was a botanical physician, and administered lobelia, from the effects of which the patient died. It was held that "if a person assume to act as a physician, however ignorant of medical science, and prescribe with an honest intention of curing the patient, but through ignorance of the quality of the medicine prescribed, or the nature of the disease, or both, the patient die in consequence of the treatment, contrary to the expectation of the person prescribing, he is not guilty of murder or manslaughter. But if the party prescribing have so much knowledge of the fatal tendency of the prescription that it may be reasonably presumed that he administered the medicine from an obstinate, willful rashness, and not with an honest intention and expectation of effecting a cure, he is guilty of manslaughter at least, though he might not have intended any bodily harm." These cases seem to us to announce a correct rule. The interests of society will be subserved by holding a physician civilly liable in damages for the consequences of his ignorance, without imposing upon him criminal liability when he acts with good motives and honest intentions.

REVERSED.