## THE STATE OF KANSAS v. VERNON M. REYNOLDS.

1. PHYSICIAN, *Not Guilty of Murder or Manslaughter.* A practicing physician and surgeon who makes an examination of the womb of a patient to learn its condition or whether she is pregnant, with an instrument commonly employed for that purpose, and who, without evil intent or culpable negligence, inadvertently inflicts a wound which results in the death of the patient, is not guilty of murder or manslaughter.

2. JUDGMENT, *Not Sustained.* The evidence in the case examined, and *held* to be insufficient to sustain the judgment of conviction.

*Appeal from Wichita District Court.*

PROSECUTION for murder.　The opinion states the case.

*J. F. Ward,* and *J. G. Waters,* for appellant.

*L. B. Kellogg,* attorney general, for The State.

The opinion of the court was delivered by

JOHNSTON, J.: Vernon M. Reynolds was prosecuted in the district court of Wichita county for murder. The information upon which he was tried charges substantially that on the 15th day of July, 1888, Dr. Reynolds unlawfully and feloniously and with malice aforethought wounded and injured one Samanda Biehn with a certain steel instrument, called a surgeon's sound, thereby inflicting a mortal wound on her womb, which caused her death on the 14th day of November, 1888. Upon the trial, which occurred at the June term, 1889, the defendant was convicted of manslaughter in the first degree; and from a judgment upon this conviction he appeals to this court.

It is quite clear that the judgment is unsupported by the testimony, and must be reversed and set aside. Samanda Biehn died on November 14, 1888, and the evidence derived from the *post-mortem* examination tended to show that the immediate cause of her death was peritonitis, which was probably induced by a cut discovered on the womb, about half an

inch long and one-eighth of an inch deep. The appellant was a practicing physician and surgeon, and Samanda was his patient, who had applied to and received treatment from him for womb disease. She was working in a tailor-shop from February, 1888, and in the early part of July complained of her health, when her employer advised her to consult with Dr. Reynolds, which she did. There is no dispute but that he treated her for some illness, and that an examination was made by him about the 15th of July, 1888, in which an instrument called a surgeon's sound was used. The theory of the prosecution, and the one on which the case was given to the jury, was, that the sound was used by the appellant for the purpose of producing an abortion, and that while engaged in the commission of that act he inflicted the wound which caused her death. In submitting the case the court instructed the jury that "if Vernon M. Reynolds did, by the use of some instrument, while in the commission of an unlawful act, inflict a wound upon the person of the deceased, and that said wound was the cause of the death of said deceased, and that said wound was inflicted without malice, express or implied, then the offense would be manslaughter in the first degree." And further, that "homicide is excusable when committed by accident or misfortune in doing any lawful act, by lawful means, with usual and ordinary caution, and without unlawful intent."

There is a total failure of proof to show any malice or intent to kill, and none to show that the surgeon's sound was used by the doctor in the commission of an unlawful act. The attorney general frankly concedes that if the conviction stands it must rest alone on what is termed a dying declaration of the deceased. This declaration was made about three months after the sound had been used by the doctor, and thirty-four days before her death. She continued in her regular employment until the day preceding the one on which the statement was made, and although the physician who attended her is called as a witness, he was not asked and did not state that he ever told her the illness would be fatal, or that she was likely to die.

21—42 KAS.

From all the circumstances surrounding the case, which need not be detailed here, we entertain great doubts of the admissibility of her dying statement in evidence. The conclusion we have reached, however, makes it unnecessary to determine that question. If we assume her declarations to be competent testimony, they still fail to show any criminality on the part of the appellant. She states that the doctor had sexual intercourse with her, after which he used the sound. According to the witness Kammer, to whom the statement is said to have been made, when asked why the sound was used she said: "He told me he was afraid she was becoming in a family way; that she had not had her monthly courses at the proper time. It was a week or ten days past the time." She did not state the purpose for which the sound was used — whether for an abortion, or merely to examine and ascertain her condition; and the proof of the experts who examined the womb is that she had not been pregnant. The testimony offered by the state is to the effect that the sound is a proper instrument for making an examination of the womb, and not one likely to be used to produce an abortion. The testimony of Dr. Reynolds as to the treatment and the purpose of the operation is as follows:

"Q. Now state, doctor, what operation you performed upon the person of Samanda Biehn on that occasion. A. I suppose you are aware that I had been doctoring her? You just want that question answered. I went there for the purpose of seeing how she was getting along, and she was complaining as she had been before, and I told her I had better make an examination of the parts, and she said, 'All right;' so I took this instrument just in that shape [shows the jury how he did it], and I introduced it just as you see right there, introduced it in that way, and then it is turned up in that shape.

"Q. Explain to the jury what that is. A. That is a speculum.

"Q. State to the jury whether or not that is the same kind of a speculum that you used in that case. A. I would say it is not.

"Q. What is the difference? A. The difference between them is this: this one has three prongs; the one I used was in only two parts.

"Q. Any other difference? A. Yes, sir, some other difference. It is best that this here run down in this way and these two places here. After I got the instrument inserted in that shape, I turned it so. The mouth of the womb was turned in. While I was doing that, she complained—she was very tender—and after I did that I looked there and the mouth of the womb was in shape so that I could see it. Says I, 'You are unwell?' And she says, 'I don't know.' She had been troubled with ulcers, and I thought it might be caused by these ulcers.

"Q. State to the jury whether you used that kind of an instrument. A. I had an instrument similar to that. And I took my dressing forceps first; I took up a piece of cotton just in that way, and I sponged off the parts and found that it was ulcers which had made her trouble, and I sponged the places and found the ulcers were bleeding to some extent. There was too much hemorrhage there for it to come from ulcers. I says, 'You are surely unwell.' Says she, 'It may be that I am.' I says, 'If you are unwell it is useless for me to make any application.'

"Q. State to the jury what wound, if any, you inflicted upon the person of Samanda Biehn that day. A. I never inflicted any wound at all.

"Q. Did you ever perform any operation on her, except that which you have testified to? A. I have performed no operation, only that stated.

"Q. State to the jury whether you ever inflicted any wound upon the person of Samanda Biehn. A. I never did.

"Q. State for what purpose that instrument was used upon that Sunday. A. I used the instrument for doctoring the patient the same as I would any other patient.

"Q. What was the matter with the patient? A. She had been troubled with womb troubles.

"Q. I will ask you to state to the jury if this girl was pregnant at that time—at the time you performed this operation. A. I would say that she was not, because she was unwell at the time.

"Q. State to the jury whether or not at any time you have ever performed any operation for the purpose of performing an abortion. A. I never did."

Accepting the statement of the deceased to the fullest extent, there is an absence of evidence to prove that the sound was used for the purpose of procuring an abortion, and, as

we have seen, the appellant specifically denies that such was the purpose for which the operation was performed. As a matter of fact there was no pregnancy, and therefore no occasion for an attempt to produce abortion. It will be conceded that if the doctor was not engaged in an unlawful act, but used the instrument to make an examination with a view of ascertaining her condition, and did so without culpable negligence or unlawful intent, he is not guilty, although while doing so he may have accidentally inflicted the injury which caused her death. (*The State v. Schulz*, 55 Iowa, 628; *Rice v. The State*, 8 Mo. 561; *Commonwealth v. Thompson*, 6 Mass. 137; 1 Hale, P. C. 429; 2 Bish. Crim. Law, 695; 3 Whar. & Stil. Med. Jour., §§ 754, *et seq.*)

The testimony goes no farther, and the conviction cannot stand. The appellant was a physician and surgeon, and there is no attempt to show that he was not competent and skillful in his profession. The instrument used in the examination was suitable and proper, and such as is commonly used for that purpose; and proof requisite to a conviction of recklessness in the use of the instrument, or of evil intent, is entirely wanting. In fact the record does not fairly establish that the wound found on her womb was even inflicted by the instrument which Dr. Reynolds used in the examination, or. that it could have been made at a period so remote as when that operation was performed.

Dr. Smith, a witness for the state, who examined Samanda in October and attended her in the last illness, was unwilling to give an opinion that an instrument had been used prior to the time he was called to attend her in October. He was then inclined to think that violence had been used in the treatment of the womb, either by herself. or some one else, but that the inflammation or peritonitis from which she died might have been caused by a cold, or any rough treatment of the womb. He stated that a well-defined wound, apparently made by some instrument, was found on the womb at the *post-mortem* examination, but that it might have been made by an instrument like the point of a probe or a syringe.

Dr. Knapp, another witness called by the state, who was a practicing physician and the coroner before whom the *post-mortem* examination was conducted, gave the following testimony:

"Q. I will ask you to state if you could tell upon the examination you made, if you are able to state the cause of the death of Samanda Biehn? A. I had an opinion of it at that time.

"Q. What is that opinion. A. That she died from peritonitis.

"Q. What was the condition, if you know, of the womb? A. It was highly inflamed and congested; the cervix was highly congested.

"Q. What was the condition of the mouth of the womb as to its being injured? A. I should think that it had been meddled with.

"Q. State to the jury whether on that examination which was made there was anything from which you could ascertain the cause of the death, except the appearance and condition of the womb. A. There was nothing.

"Q. Describe the wound that was on the mouth of the womb at that time. A. I don't know that I can very well.

"Q. State to the jury what was indicated by the condition of the wound that you refer to; how long had it been made? A. From the appearance of it, it would seem that it had been made very recently. Half the neck of the womb presented the appearance of having been handled very roughly.

"Q. What do you mean by the expression, 'very recently'? A. Well, within three or four weeks.

"Q. State what your conclusion is in regard to the likelihood of that wound having been inflicted as long previous as July 15. A. I don't believe it was.

"Q. What kind of an instrument would you say produced that wound? A. Some blunt instrument. It could be inflicted with the nozzle of a syringe, or with a blunt-pointed lead pencil, with a family catheter, or any blunt instrument of the size of a lead pencil.

"Q. Doctor, I will ask you to state to the jury whether or not a wound like that which appeared upon this womb, inflicted in July, 1888, would be recognizable in November, 1888. A. In my opinion it would not be recognizable if it was left alone.

"Q. State to the jury whether or not such a wound as that

you have described as being upon this womb might not have been a cut.   A.  I think it was a cut.   It didn't look to me as if it was made by a blunt instrument.

"Q.  State to the jury whether or not in your opinion that wound was made with a surgeon's sound, or any kind of a sound.   A.  I don't believe it was.

"Q.  State to the jury, doctor, what is the ordinary use of the sound.   A.  Explorations of the outside of the womb, and where you can see, to explore the interior of the womb; and it is never used for abortions at all."

This is the evidence of the prosecution, and is corroboration of that given by Dr. Reynolds.   It is the testimony of two of the principal witnesses for the state, and tends strongly to show that the wound which caused the peritonitis and death was inflicted long after July, when the sound was used by Dr. Reynolds, and also that it was made by some other instrument than a surgeon's sound.   If a wound was made subsequent to July, 1888, as seems to have been the case, it was done by some one other than the defendant, for the undisputed evidence is, that he did not use an instrument nor perform an operation on the patient after the one conceded to have been performed in July.

We are clearly of the opinion that the judgment is unsupported by the testimony and unauthorized by law, and it will therefore be reversed, and the defendant discharged from custody.

All the Justices concurring.