(965 P.2d 211)
No. 77,069

STATE OF KANSAS, *Appellee*, v. L. STAN NARAMORE, D.O., *Appellant*.

Opinion filed July 24, 1998.

*Kurt P. Kerns*, of The Law Offices of Leslie F. Hulnick, P.A., of Wichita, and *R. Pete Smith* and *Anthony L. Gosserand*, of McDowell, Rice, Smith & Garr, P.C., of Wichita, for the appellant.

*John K. Bork*, assistant attorney general, and *Carla J. Stovall*, attorney general, for the appellee.

*John P. Sevastos, D.O.*, of Chicago, Illinois, for *amicus curiae* American Osteopathic Association.

*Quentin L. Brown*, of Logan, Riley, Carson & Kaup, L.C., of Overland Park, for *amicus curiae* Kansas Osteopathic Association.

*Wayne T. Stratton* and *Anne M. Kindling*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, for *amicus curiae* Kansas Medical Society.

Before BRAZIL, C.J., PIERRON, J., and MERLIN G. WHEELER, District Judge, assigned.

PIERRON, J.: On July 15, 1994, the office of the Attorney General filed a two-count complaint against Dr. Lloyd Stanley Naramore, a licensed Kansas physician. Count I charged him with the attempted murder of Ruth Leach. Count II charged him with the premeditated first-degree murder of Chris Willt. Both counts arose out of actions taken by Dr. Naramore during his medical treatment of Mrs. Leach and Mr. Willt in August 1992.

A jury trial was held in January 1996. The jury returned verdicts of guilty of attempted murder on Count I and guilty of the lesser included offense of intentional and malicious second-degree murder on Count II. Dr. Naramore was sentenced to concurrent terms of 5 to 20 years. He is apparently now free on parole. He appeals his convictions on the grounds of alleged insufficient evidence and numerous other errors.

In addition to the extensive briefs of the State and Dr. Naramore, we have been provided with *amicus curiae* briefs filed by the Kansas Association of Osteopathic Medicine (KAOM), The American Osteopathic Association (AOA), and The Kansas Medical Society (KMS).

The KAOM is a voluntary professional association of over 350 osteopathic physicians in Kansas. Osteopathic physicians are full-service health care providers, licensed and regulated by the Kansas Board of Healing Arts to practice medicine and surgery.

The AOA is the national professional association for osteopathic physicians and osteopathic medicine.

The KMS is a voluntary organization representing over 4,200 physicians throughout Kansas. The KMS has appeared in the past as *amicus curiae* before the appellate courts of Kansas when issues involving the ability of physicians to provide quality health care have been involved.

The court has carefully reviewed all the briefs and has done substantial research itself. We can find no criminal conviction of a physician for the attempted murder or murder of a patient which has ever been sustained on appeal based on evidence of the kind presented here. To explain the basis for our rulings, it will be necessary to give a very detailed account of the expert evidence presented at trial and certain facts concerning medical practices in dealing with terminally and critically ill patients.

*Ruth Leach*

Mrs. Ruth Leach, a 78-year-old woman, had been suffering from cancer for a number of years. She was admitted to the St. Francis Hospital in St. Francis, Kansas, in May 1992. Her son and daughter-in-law, Jim and Cindy Leach, saw her frequently at the hospital and paid her a visit on the evening of August 2, 1992. Jim's sister Judy Monroe was already at the hospital visiting Mrs. Leach. Jim testified his mother had "gone downhill dramatically" since his last visit. The cancer had spread widely, and her condition was terminal.

Cindy Bizer, Mrs. Leach's nurse that evening, told the family the morphine patches used for pain medication were apparently not doing the job because Mrs. Leach seemed restless. Bizer suggested calling Dr. Naramore to prescribe a stronger dose of pain medication. Dr. Naramore came to the hospital and examined Mrs. Leach. She told him she felt terrible. Dr. Naramore and the Leach family went to the hospital chapel where they could have some privacy.

Dr. Naramore asked the family what they wanted to do, and Jim said he wanted his mother to have more painkillers. Dr. Naramore explained that when extra pain medication is given to a patient in

Mrs. Leach's condition, it slows respiration and there is a real danger the patient can die. Mrs. Leach had developed a relatively high level of tolerance for pain medication by that time. The family discussed Mrs. Leach's living will and her desire to have no heroic measures taken to save her life, and then told Dr. Naramore to give her more pain medication.

One of the key issues involved in this case involves what is known as "palliative care." The KMS, in its *amicus* brief, makes the following observation regarding palliative care:

" 'Physicians are healers of disease and injury, preservers of life, and relievers of suffering.' *Decisions*, 267 JAMA at 2230. These roles sometimes conflict, however. Pain management for patients in the later stages of cancer presents a particular challenge for physicians. Palliative care refers to medical intervention in which the primary purpose is to alleviate pain and suffering. It is sometimes referred to as having a 'double effect,' however, because in addition to relieving pain and suffering, the level of pain medication necessary to relieve pain may have the consequence of shortening life. Thus, the health care provider's role as healer conflicts with his or her role as reliever of suffering when increasing amounts of pain medication are required to provide comfort care, but these increasing doses may have the effect of slowing respirations and thereby hastening death. Numerous authorities recognize that cancer patients frequently receive inadequate pain relief. See, *e.g.*, Cherny and Catane, *Editorial: Professional Negligence in the Management of Cancer Pain*, 76 Cancer 2181 (December 1, 1995) (*Management of Cancer Pain*) . . . ; Von Roenn, *et al., Physician Attitudes and Practice in Cancer Pain Management*, 119 Ann. Intern. Med. 121 (July 15, 1993). In fact, one cause of the failure of physicians to adequately control pain is fear of legal sanctions. See Johnson, *Disciplinary Actions and Pain Relief: Analysis of the Pain Relief Act*, 24 J.L. Med. & Ethics 317, 320, 326 (Winter 1996), and other articles in same issue; *Ethics of Pain Management*, 9 J. Pain & Symptom Mgmt. at 166. On the other hand, it has also been suggested that inadequate control of pain due to substandard treatment may constitute medical negligence. *Management of Cancer Pain*, 76 Cancer at 2183. See Casswell, *Rejecting Criminal Liability for Life-Shortening Palliative Care*, 6 J. Contemp. Health L. & Pol'y 127 (Spring 1990), for an analysis of the issues surrounding the criminalization of palliative care.

"The [American Medical Association]'s Council on Ethical and Judicial Affairs has adopted the position that ' "the administration of a drug necessary to ease the pain of a patient who is terminally ill and suffering excruciating pain may be appropriate medical treatment even though the effect of the drug may shorten life." ' *Decisions*, 267 JAMA at 2231, quoting Council on Ethical and Judicial Affairs. Euthanasia: report C. In: Proceedings of the House of Delegates of the AMA; June 1988; Chicago, Ill:258-260. Thus, a health care provider is ethically permitted, and perhaps even required, to implement pain medication and palli-

ative care, with the consent of the patient or the patient's family, notwithstanding the potential for hastening death. This position recognizes that there is an ethical distinction between providing palliative care which may have fatal side effects and providing euthanasia. Whereas the goal in palliative care is providing comfort care to relieve suffering even though death may occur, the goal of euthanasia is itself to cause death and through death relieve the suffering. Perhaps a subtle distinction, but an important one, for in providing palliative care the intent is to relieve suffering, not to kill. Other authorities also suggest that actions constitute palliative care, not euthanasia, when the patient is suffering, the care is appropriate to the level of suffering, and 'the actions are not intended to lead directly and deliberately to death.' Gordon and Singer, *Decisions and Care at the End of Life*, 346 Lancet 163, 165 (July 15, 1995)."

The KAOM also addresses this specific issue in part by reference to Wanzer *et al.*, "The Physician's Responsibility Toward Hopelessly Ill Patients," 320 New Eng. J. Med. 844, 847 (March 30, 1989), which states:

"In the patient whose dying process is irreversible, the balance between minimizing pain and suffering and potentially hastening death should be struck clearly in favor of pain relief. Narcotics or other pain medications should be given in whatever dose and by whatever route is necessary for relief.

. . . .

"If pain cannot be controlled with the commonly used analgesic regimens of mild or moderate strength, the patient should be switched quickly to more potent narcotics. It is important that doses be adequate . . . . Doses should be brought promptly to levels that provide a reliable pain-free state. . . . *To allow a patient to experience unbearable pain or suffering is unethical medical practice.*" (Emphasis added.)

The KAOM further states:

"The medical literature documents time and again that physicians significantly *under* treat pain, including cancer-related pain. . . . Reasons cited for this phenomenon include a fear of discipline for use of opioids, and a fear of malpractice claims. The modern consensus in medical thinking, however, is a patient's pain *must* be controlled in her terminal illness, even if hastening death is a possible outcome."

With this review of medical opinion on palliative care, which appears to be in large part common sense, we can have a better perspective on what occurred after the Leach family told Dr. Naramore to administer more pain relievers to attempt to control Mrs. Leach's pain.

Jim testified that as the family left the chapel to return to Mrs. Leach's room, Dr. Naramore stated, "I usually take care of things like this myself, but since you are medical people, why don't you come on down with me." Dr. Naramore's remark about "medical people" was in reference to Jim being an emergency medical technician.

At 9:30 p.m., Dr. Naramore gave Mrs. Leach a 4-milligram shot of Versed, a painkiller, and at 9:35 p.m., he gave her a 100-micromilligram shot of Fentanyl, an anesthetic. Jim testified his mother's respiration slowed to a very low level. He thought she was close to death. Jim testified Dr. Naramore asked everyone to hold hands, and he recited a poem by Robert Frost called "Into the Woods." He told them he could reverse the effects of the pain medication by giving a drug called Narcan. Jim believed Dr. Naramore had given Mrs. Leach an overdose and asked the family, "Aren't we going to reverse it?" No one answered.

At this point, Dr. Naramore prepared a syringe of morphine. Jim told him to not give his mother any more medication because he thought the injection would kill her. Bizer testified Dr. Naramore stated, "I'm not going to give her any more, we can reverse these effects by giving her Narcan." Bizer testified that in her opinion Narcan is given only if there has been an overdose.

Jim and Dr. Naramore went into the hallway. Jim told Dr. Naramore he was giving his mother too much medication. Jim said, "Let me make one thing perfectly clear: I'd rather my mother lay there and suffer for ten more days than you do anything to speed up her death." Jim testified that Dr. Naramore told him that "it just gets terrible from here on out," and "[t]he next few days for her are just going to be absolutely terrible." Dr. Naramore complied with Jim's request to give Mrs. Leach minute amounts of morphine, and he set up an IV for a slow drip of morphine.

Dr. Naramore asked Jim, "If I continue to treat your mother, will you hold me responsible if anything happens to her." Jim replied with a very emphatic, "Yes, I will." Dr. Naramore did not want to be further involved in the case. Jim had Mrs. Leach transported to a hospital in Goodland, Kansas, the next morning. She

was given morphine injections at the Goodland hospital. She died a couple of days later, presumably from the course of the cancer.

Bizer testified she collected the syringes used by Dr. Naramore. Dale Rundle, a Kansas Bureau of Investigation (KBI) forensic toxicologist, testified that one of the syringes tested positive for Narcan, but he was unable to confirm this result because of the minute quantity left in the syringe. Carl Selavka, a forensic chemist with National Medical Services in Philadelphia, Pennsylvania, did not find Narcan in the syringe.

Special Agent Mark Kendrick of the KBI interviewed Dr. Naramore on two separate occasions regarding his treatment of Mrs. Leach. Kendrick testified that in the first interview, Dr. Naramore told him Narcan had been prepared, but not given. In the second interview, he indicated Narcan was never around. Dr. Naramore told Kendrick he did not conduct a medical euthanasia on Mrs. Leach but did everything he could to make her more comfortable in her suffering.

*Chris Willt*

On August 5, 1992, Mr. Willt was found slumped over in a booth at a St. Francis convenience store. Mr. Willt, an 81-year-old man, was obese and a severe diabetic with a history of heart disease. He had a pacemaker and had been taking Coumadin, a blood thinner, prescribed to protect him against dangerous blood clotting. However, several days prior to the incident, Mr. Willt had refused to continue taking the Coumadin.

Larry Gable, an emergency medical technician, testified that Mr. Willt had an irregular heart beat, difficulty breathing, and moist and clammy skin, and he could not speak. His right arm was limp, while his left arm was strong and rigid. Gable diagnosed Mr. Willt as having had a possible cerebral vascular accident or stroke. Gable did not know Mr. Willt was a diabetic. He was transported to St. Francis Hospital.

Dr. Naramore was called to the hospital. When he arrived, Dr. Naramore stated, "Out of the way, he's an uncontrolled diabetic." Mr. Willt was given the drug Norcuron through an IV so he could be intubated. Norcuron is a paralyzing agent which incapacitates

the patient. After receiving Norcuron, a person cannot breathe on his or her own and must have someone artificially breathe for them. During intubation, a tube is placed down the trachea so air can be pumped into the lungs. At St. Francis Hospital, a bag is attached to the tube which must be squeezed manually (bagging) for the patient to be able to breath. All of this is normal procedure for a case of this kind.

Several nurses chronicled the care delivered over the next 3 hours by Dr. Naramore and the nursing staff. This included continual artificial ventilation, pulse and blood pressure monitoring, administration of drugs, and cardioversion (electric shocks to the heart) to see if Mr. Willt's pacemaker would take control.

Dale White, hospital administrator, testified Dr. Naramore told him that Mr. Willt had apparently suffered a massive stroke, his left pupil was fixed and dilated, and the case was futile. White testified Dr. Naramore said they could lifeflight Mr. Willt to a big hospital where he could be put on a ventilator, but it would be a waste of money since he would be a vegetable. Dr. Naramore opined that Mr. Willt was "brain dead" and wanted White's opinion on removing life support. White told Dr. Naramore that if Mr. Willt was "brain dead" and if he had a second opinion from a neurologist, then life support could be withdrawn.

In December 1987, the Council on Ethical and Judicial Affairs of the American Medical Association issued a series of guidelines to assist hospital medical staffs in formulating appropriate resuscitation policies. See Council Report, *Guidelines for the Appropriate Use of Do-Not-Resuscitate Orders*, 265 J.A.M.A. 1868 (April 10, 1991).

The Guidelines suggest that while there is a presumption favoring cardiopulmonary resuscitation (CPR) because a patient in need of CPR is unable to express his or her treatment preference, an exception to that presumption is recognized where, in the judgment of the treating physician, an attempt to resuscitate the patient would be futile. Where the patient is unable to make a decision regarding the use of CPR, that decision may be made by a surrogate decision maker. "Physicians should not permit their personal value judgments about quality of life to obstruct the implementa-

tion of a patient's or surrogate's preferences regarding the use of CPR. However, if in the judgment of the treating physician, CPR would be futile, the treating physician may [make that decision]." *Guidelines*, 265 J.A.M.A. at 1871.

In *Barber v. Superior Court of Los Angeles County*, 147 Cal. App. 3d 1006, 1018, 195 Cal. Rptr. 484 (1983), the court recognized that a physician has no duty to continue treatment that is ineffective:

> "A physician is authorized under the standards of medical practice to discontinue a form of therapy which in his medical judgment is useless . . . . If the treating physicians have determined that continued use of a respirator is useless, then they may decide to discontinue it without fear of civil or criminal liability. By useless is meant that the continued use of the therapy cannot and does not improve the prognosis for recovery. (Horan, *Euthanasia and Brain Death: Ethical and Legal Considerations* (1978) 315 Annals N.Y.Acad. Sci. 363, 367, as quoted in President's Commission, supra, ch. 5, p. 191, fn. 50.)"

The KMS also posits that "[s]topping a resuscitation attempt is always a difficult decision, but it must remain the decision of the attending physician in the exercise of his or her professional medical judgment."

White and Dr. Naramore advised Mr. Willt's brother, Rudy, of the situation. Rudy informed them that Mr. Willt's left eye was glass, so the irregular eye condition was irrelevant. After a discussion with his minister and his niece, Rudy decided that Mr. Willt would not want to be maintained artificially.

At approximately 11:20 p.m., White noticed slight movement in Mr. Willt's arms and legs. The movements became stronger and Mr. Willt's fingers and toes wiggled. White remembered one of the staff commenting, "I think he's coming around." Dr. Naramore believed the movements were seizure activity. White, a registered nurse, testified that as he was suctioning Mr. Willt's throat, Willt's jaw clenched down on the suction tube and he made a gagging sound. White said he saw a "facial grimace."

Dr. Naramore listened to Mr. Willt's chest with a stethoscope while he was being ventilated. The ventilation was stopped to check Mr. Willt's reaction. White testified that it looked like Mr. Willt was trying to breathe but could not, and the pulse oximeter de-

scended rapidly. Ventilation was resumed, and Dr. Naramore again diagnosed the movements as seizure activity.

For a second opinion, Dr. Naramore asked a nurse to call Dr. Ernest Cram, a local physician. At 12:15 a.m., Dr. Naramore administered a 5-milligram shot of Norcuron through the IV. This is what is called a "maintenance dose," to maintain the status quo.

Dr. Cram testified that Mr. Willt had no pulse, respiration, or reflexes. After the examination, Dr. Cram stated, "He's gone." Mr. Willt was receiving artificial ventilation and CPR when Dr. Cram arrived. Nurse Vohs remembered Dr. Cram saying, "It's kind of like beating a dead horse."

White told Dr. Cram about Mr. Willt's movements and that Dr. Naramore had just given him a shot of Norcuron. Dr. Cram replied he had not been informed of those facts and was not sure of Norcuron's effects but would "look it up." White indicated that Dr. Cram came back shortly and stated that he still concurred with Dr. Naramore.

At 12:24 a.m., mechanical ventilation was stopped, and the cardiac monitor showed only pacemaker activity. At 12:30 a.m., there was no spontaneous neurological activity, no respiratory activity, and no cardiac activity. Mr. Willt was pronounced dead at 12:32 a.m., with his brother Rudy in attendance.

During his interview with Special Agent Kendrick, Dr. Naramore stated the purpose of the second shot of Norcuron was to keep Mr. Willt from "bucking out" the breathing tube. Apparently, if Mr. Willt was alive this would have been the correct procedure. If he was dead, it obviously would not have made any difference one way or the other. Dr. Naramore told Kendrick it did not make sense for him to do everything medically possible for 3 hours to save Mr. Willt's life just so he could kill him.

Before we turn to the substantial expert medical evidence presented by the State and Dr. Naramore, we should first review the critical issues of law that are controlling in this case.

The trial court correctly instructed the jury as to the general burden of proof in criminal cases in Instruction No. 6:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty until you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims made by the State, you must find the defendant not guilty; if you have no reasonable doubt as to the truth of any of the claims made by the State, you should find the defendant guilty."

On the charges for which Dr. Naramore was convicted, the court further correctly instructed the jury on the elements of murder in the second degree and attempted murder in the first degree.

Instruction No. 13:

"If you cannot agree that the defendant is guilty of murder in the first degree, you should then consider the lesser included offense of murder in the second degree.

"To establish this charge each of the following claims must be proved:

1. That the defendant intentionally killed Chris Willt:
2. That such killing was done maliciously; and
3. That this act was done on or about the 5th day of August, 1992, in Cheyenne County, Kansas."

Instruction No. 15:

" The defendant is charged with the crime of an attempt to commit murder in the first degree. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. That the defendant performed an act toward the commission of the crime of murder in the first degree.
2. That the defendant did so with the intent to commit the crime of murder in the first degree.
3. That the defendant failed to complete commission of the crime of murder in the first degree; and
4. That this act occurred on or about the 2nd day of August, 1992, in Cheyenne County, Kansas.

The elements of murder in the first degree are:

1. That the defendant attempted to intentionally kill Ruth Leach;
2. That such attempted killing was done maliciously;
3. That it was done deliberately and with premeditation."

· The court also provided other appropriate instructions defining certain key words.

Instruction No. 17:

" 'Maliciously' means willfully doing a wrongful act without just cause or excuse.

" 'Deliberately and with premeditation' means to have thought over the matter beforehand.

" 'Willfully' means conduct that is puposeful and intentional and not accidental.

" 'Intentionally' means conduct that is purposeful and willful and not accidental."

We note the jury was given no instructions (none were requested) on the very difficult issues of palliative care and what are appropriate resuscitation attempts. These are not issues that are generally within the knowledge of a layperson. Appropriate instructions would be necessary if they are issues, to give guidance to the jury in deliberations.

Requiring proof beyond a reasonable doubt for the imposition of criminal guilt is, of course, one of the most important principles of Anglo-American jurisprudence. It is a standard that is higher than a mere preponderance of the evidence, which is required to find a physician has committed malpractice. It is also a higher standard than that required to support actions regarding the restriction or revocation of the license to practice medicine in Kansas. See K.S.A. 77-621; *Vakas v. Kansas Bd. of Healing Arts*, 248 Kan. 589, 594, 808 P.2d 1355 (1991).

Even though proof beyond a reasonable doubt is a basic principle in the adjudication of criminal charges, it is one that is not completely susceptible to precise definition. We depend a lot on jurors knowing it when they see it. Our standard for reversal of a jury finding of criminal guilt on the basis of insufficient evidence is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Claiborne*, 262 Kan. 416, Syl. ¶ 5, 940 P.2d 27 (1997).

With such a strict standard of review it is not surprising that so few verdicts are reversed on this ground. Reversals are few, but not unheard of. We recognize that juries sometimes make serious errors and return verdicts of guilty on evidence which cannot reasonably support such a finding. This can occur if a jury ignores a fully supported, reasonable explanation for the defendant's actions which negates criminal guilt.

In the very first criminal case reviewed by the Kansas Supreme Court, *Horne v. State of Kansas*, 1 Kan. 42 (1862), the court stated in Syl. ¶ 2:

"A few facts, or a multitude of facts proven, all consistent with the supposition of guilt, are not enough to warrant a verdict of guilty. In order to convict on circumstantial evidence, not only the circumstances must all concur to show that the prisoner committed the crime, but they must all be inconsistent with any other rational conclusion."

A slightly different formulation was set out in *State v. Grebe*, 17 Kan. 458, 461 (1877), where it was pointed out that in cases of circumstantial evidence the circumstances must be "such as to exclude every other reasonable hypothesis than that of defendant's guilt."

In *State v. Jolly*, 196 Kan. 56, 61, 410 P.2d 267 (1966), the court approved a portion of the jury instructions which read: " 'Crime[s] may be proved by circumstantial evidence as well as by direct testimony of eye-witnesses, but the facts and circumstances in evidence must not only be consistent with each other and with the guilt of the defendant, but they must be inconsistent with any reasonable theory of defendant's innocence.' " See 29A Am. Jur. 2d, Evidence § 1467 nn. 6-15; and citations noted in West's Kansas Digest 2d, Criminal Law § 552(3) (1994).

Our Supreme Court has qualified these statements somewhat in later decisions. In *State v. Morton*, 230 Kan. 525, 530, 638 P.2d 928 (1982), the court states: "The theory that the prosecution is under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt has been rejected. [Citations omitted.]" See West's Kansas Digest 2d, Criminal Law § 552(3). Factually, these cases seem to focus on whether there was a reasonable and substantial alternative explanation for the facts on which the convictions were based, not just a mere hypothetical possibility of innocence or guilt of a lesser charge.

The State's case must rebut reasonable theories of innocence that are supported by substantial competent evidence. But the State need not pursue every chimera that can be called forth by the fertile imagination of the defense.

We will now turn to the impressive array of expert medical testimony presented by the State and the defense in this case.

Dr. Kris Sperry testified during the State's case in chief. Dr. Sperry performed a forensic autopsy on Mr. Willt on November

16, 1992, after the body had been exhumed. He testified Mr. Willt had a pacemaker and severe narrowing of the primary artery to his heart. Dr. Sperry ruled out heart disease as the cause of death. He also stated that a person must live for at least 6 hours after suffering a stroke in order for there to be any evidence in the brain of the stroke. Because of that and the condition of Mr. Willt's brain at the time of the autopsy, apparently due to inadequate embalming, Dr. Sperry could not rule out a stroke as the cause of death.

In Dr. Sperry's opinion, Mr. Willt died as a consequence of asphyxia, or lack of oxygen. He believed this occurred because he was paralyzed by the injection of Norcuron, and when resuscitation was terminated, he was unable to breathe. Dr. Sperry opined that Mr. Willt's diabetic condition and low blood sugar level mimicked the symptoms of a stroke.

Dr. Dennis Allin, Director of Emergency Medicine at the University of Kansas Medical Center and the Medical Director of Kansas City, Kansas, Emergency Medical Services, reviewed Mrs. Leach's medical records and testified that she appeared to be near death after Dr. Naramore gave the Versed and Fentanyl injections. Dr. Allin indicated that Mrs. Leach would have died had Dr. Naramore given her the morphine injection. It was Dr. Allin's opinion that Dr. Naramore's use of Versed and Fentanyl was for the purpose of hastening or accelerating Mrs. Leach's death.

Dr. Allin also testified that Dr. Naramore managed Mr. Willt's case extremely well in its early stages, including the use of Fentanyl and Norcuron to establish an airway and control the hypoglycemia. However, he disagreed with Dr. Naramore's conclusion that Mr. Willt was unsalvageable and opined that the medical records did not support the position that Mr. Willt was "brain dead." Dr. Allin testified that if a patient is "brain dead," there are no seizures or movements, and there would be no medical reason to give Norcuron after declaring someone "brain dead."

Dr. Allin believed Mr. Willt's movements were a result of the medications beginning to wear off. He stated it was ridiculous for two physicians to discuss whether a patient was "brain dead" while the patient was under the influence of Norcuron. Dr. Allin stated he did not take issue with Dr. Naramore giving the second dose of

Norcuron because of Mr. Willt's movements and reflexes. However, Dr. Allin stated a doctor could not judge Mr. Willt's neurological status at that time to determine whether to withdraw life support.

Dr. Allin also stated that Norcuron does not have an impact on blood pressure or pulse. He agreed that if a patient did not have a pulse, it did not matter whether the patient was on Norcuron.

Dr. Thomas Poulton, a specialist in anesthesiology and critical care medicine at the University of Vermont College of Medicine, also testified in the State's case. Dr. Poulton was a consultant for the Kansas Board of Healing Arts and had worked at St. Francis Hospital & Medical Center in Topeka before going to Vermont.

Dr. Poulton stated the dose of Versed combined with the dose of Fentanyl that Mrs. Leach received was an excessive dose of medication and could have made her stop breathing in short order and would have killed her. He said any additional depressant such as morphine could have only added to the certainty of her death.

Dr. Poulton stated Mr. Willt was hypoglycemic and most likely did not have a heart attack or stroke. He opined Mr. Willt died because he was paralyzed by the Norcuron and could not breathe after artificial ventilation ceased. He testified that Mr. Willt was absolutely not "brain dead" when ventilation was stopped because of the movements and seizures. Dr. Poulton indicated that Mr. Willt's low body temperature and the dosages of Norcuron prevented proper evaluation of whether he was "brain dead." We note that if Mr. Willt *was* dead, the Norcuron would never have been metabolized.

In addition to Dr. Cram, the defense called five physicians in its case in chief. Dr. Bruce Alter, a physician in St. Francis, testified he had treated Mrs. Leach for 5 years prior to her death. Dr. Alter found it phenomenal that anyone had accused Dr. Naramore of trying to kill her. He indicated Mrs. Leach had been on a variety of painkillers which had not controlled her pain.

With regard to Mr. Willt's case, Dr. Alter said you cannot kill a person who is already dead. Dr. Alter had also treated Mr. Willt and knew about his diabetes and pacemaker and that he was on blood thinners, had fainting spells, and refused to take his medi-

cations. Dr. Alter believed Mr. Willt had a massive stroke which ultimately caused his death. Dr. Alter noted that at midnight Mr. Willt only had pacemaker activity. In response to the State's questioning on the twitching or movements before the second shot of Norcuron, Dr. Alter stated the movements were based on the spinal cord and the involuntary system. He testified a person can have spontaneous movement even after death—similar to the involuntary movements made by a snake or chicken after its head is cut off.

Dr. Larry Anderson, a family physician from Wellington, Kansas, also testified for the defense. Dr. Anderson testified that Mr. Willt was lucky to have been alive because of his serious health problems. He described Dr. Naramore's treatment of him as a 3-hour heroic effort to save his life. Dr. Anderson opined that Mr. Willt had suffered a massive left cerebral stroke and would have never used the right side of his body again.

Dr. Anderson said it was poor terminology by Dr. Naramore to use the words "brain dead" in describing Mr. Willt's condition. He said "brain dead" refers to a specific set of clinical findings and not just a general finding that the patient is actually dead, although still exhibiting some life signs. He indicated the second dose of Norcuron was irrelevant since Dr. Cram had testified Mr. Willt had no pulse. Dr. Anderson concluded that Dr. Naramore had no intent to murder Mr. Willt.

Dr. Anderson also testified that Dr. Naramore had treated Mrs. Leach with compassion and concern. He stated if someone intended to kill a patient, they would use 10 times the dosage given by Dr. Naramore. Dr. Anderson concluded that Dr. Naramore did not intend to kill Mrs. Leach.

Dr. Tom Simpson is a family physician in Sterling, Kansas, and serves on the "peer review" (physician performance evaluation by other physicians) committee for Blue Cross Blue Shield. He testified concerning Dr. Naramore's performance based on his review of the records. Dr. Simpson recounted the complete medical history of both Mrs. Leach and Mr. Willt. Dr. Simpson gave as his opinion that Dr. Naramore's sole intent in giving the medications to Mrs. Leach was to provide comfort and relief of her suffering.

Dr. Simpson stated the amount of Versed and Fentanyl given to Mrs. Leach did *not* constitute an overdose based on the amount of pain medication she had received in the past and her increased tolerance. Dr. Simpson testified that Mr. Willt was dead cardiovascularly (as opposed to "brain dead") *before* ventilation was stopped, and he died due to a combination of a stroke and heart failure.

Dr. Michael Arnall, a certified anatomic, clinical, and forensic pathologist, took issue with many of Dr. Sperry's conclusions. Dr. Arnall disagreed with the conclusion that a complete autopsy of Mr. Willt revealed no evidence of an acute disease process or medical condition that would have been otherwise independently responsible for Mr. Willt's death. Dr. Arnall stated that a complete examination was not possible because the brain had liquefied from decomposition.

Dr. Arnall also testified there were indications that Mr. Willt might have suffered a heart attack. He stated medical records indicated Mr. Willt had a 75% blockage of the coronary artery in 1991, which was sufficient in and of itself to cause death. The medical records also indicated that x-rays taken on the evening of his death showed a bilateral pulmonary edema (fluid in the lungs), which caused the heart to not pump blood in an acceptable fashion. Dr. Arnall reiterated that Mr. Willt had an enlarged heart, a pacemaker, and a history of congestive heart failure.

Dr. Michael David, a family physician from Independence, Kansas, and president of the KAOM, also testified for the defense. He reviewed the complete medical history of both cases and opined that Dr. Naramore's treatment of both patients was exemplary. Dr. David testified there was nothing in the medical records to suggest any premeditation on Dr. Naramore's part to harm either patient. He stated that Dr. Naramore's care did not fall below the standard of care for Doctors of Osteopathic Medicine in the state of Kansas. Dr. David also testified that the doses of medication given to Mrs. Leach did *not* constitute an overdose or support the finding of an intent to kill.

On appeal, Dr. Naramore challenges the sufficiency of the evidence supporting his convictions.

Dr. Naramore's sufficiency argument is fairly straightforward. He states five medical experts testified that Mr. Willt was already dead prior to ventilation being stopped. Dr. Cram's examination revealed Mr. Willt had no pulse, a situation not affected by the second shot of Norcuron. Dr. Arnall testified that major heart failure and a stroke caused Mr. Willt's death, and the two causes could not be ruled out by Dr. Sperry. Dr. Naramore argues that the second dose of Norcuron was a standard dosage to maintain the airway if Mr. Willt was alive, so that a second opinion could be obtained from Dr. Cram. As a result, he contends a rational factfinder could not find Dr. Naramore guilty beyond a reasonable doubt of intentional second-degree murder since his actions were arguably medically appropriate and he lacked the intent to kill.

Dr. Naramore states several experts testified as to what constituted an overdose of the medications he gave Mrs. Leach. He points out that the State's experts conceded the amounts given to Mrs. Leach did *not* indicate a clear intent to kill, which was supported by her initial survival. Also, Dr. Naramore told Jim he was *not* going to give Mrs. Leach the morphine after it was apparent her breathing had slowed drastically. As a result, Dr. Naramore contends there was insufficient evidence for a rational factfinder to conclude beyond a reasonable doubt that he attempted to kill Mrs. Leach by preparing a syringe of morphine.

In response, the State argues both parties presented their evidence and the jury believed the State's evidence. Among other evidence, the State cites testimony in the Leach case that Dr. Naramore gathered everyone in the hospital chapel and asked if anyone needed to see Mrs. Leach. He then said, "I usually take care of things like this myself, but since you are medical people, why don't you come on down with me."

Dr. Allin and Dr. Poulton considered the amount of pain medication given to Mrs. Leach to be an overdose and that one more dose of morphine would have killed her had it been administered. The State contends it was only when Jim expressed concern about Mrs. Leach's condition that Dr. Naramore was stopped from giving the additional dose of morphine. The State argues a rational factfinder could find Dr. Naramore guilty of attempted first-degree

murder since he attempted to kill Mrs. Leach with the additional dose of morphine, but was prevented from doing so.

The State also argues a rational factfinder could find Dr. Naramore guilty of the second-degree murder of Mr. Willt. The State maintains the act of paralyzing a person so he or she cannot move or breathe and then stopping artificial ventilation for that person, constitutes intentional second-degree murder. The State recognizes the testimony of the defense experts but argues the jury simply chose to believe the State's witnesses and evidence.

Kansas law in this area is quite sparse. *State v. Reynolds*, 42 Kan. 320, 22 Pac. 410 (1889), is apparently the only case within the last century or so in which a physician was prosecuted for what was arguably the exercise of clinical judgment. The facts of that case make it of no use for our analysis.

40 Am. Jur. 2d, Homicide § 99 addresses the criminal liability of physicians based on their exercise of clinical judgment. The section observes that "courts are generally agreed that negligence exists when the physician or surgeon . . . exhibits gross lack of competency or gross inattention." Further, a physician who causes the death of a patient through criminally negligent practice of medicine will at most be guilty of manslaughter.

The American Osteopathic Association, in its *amicus curiae* brief, makes the following comments regarding criminal responsibility of physicians in the treatment of terminally ill patients:

"Physicians, in providing medical care to their patients, are forced to make difficult decisions under challenging circumstances. The very essence of the practice of medicine is the exercise of clinical judgment. Doctors, drawing upon their years of medical education and training, consider the particular details of a patient's condition and balance the efficacy of a possible treatment with the risk and severity of potential side effects. In some cases, the correct diagnosis or course of treatment may not be apparent. At other times, particularly involving the terminally ill or the elderly, a promising treatment may carry—even fatal—risks. After considering the potential benefits and risks, the physician must act in the best interests of the patient.

"Years of medical education and training cannot avoid the simple truth that physicians are human and, consequently, fallible. The fact that a physician makes a reasonable mistake should not subject him to criminal responsibility. Criminal responsibility should attach only to those physicians whose mistakes are egregious

or who demonstrate a gross level of incompetence or indifference in their treatment."

We note the cases of *In the Matter of Spring*, 380 Mass. 629, 405 N.E.2d. 115 (1980); *Commonwealth v. Edelin*, 371 Mass. 497, 359 N.E.2d 4 (1976); *People v. Einaugler*, 208 App. Div. 946, 618 N.Y.S.2d 414 (1994); *Com. v. Youngkin*, 285 Pa. Super. 417, 427 A.2d. 1356 (1981); *State v. Warden*, 813 P.2d 1146 (Utah 1991).

In these cases the courts have noted the necessity for a clear showing of acts that are "wanton," "reckless," "irresponsible and totally inappropriate," "grievously unreasonable," or are a "gross deviation from the standard of conduct a reasonable person would observe" before there can be a finding of even negligent homicide.

With this legal background, we turn to the question of the sufficiency of the evidence in this case. The State rightly notes the deference we give jury findings and frames the argument by saying that the jury simply believed one evidentiary scenario over another and since there is substantial competent evidence in support of the verdict, it should be affirmed.

The difficulty we have with this argument is the nature of the case, the evidence presented, and the fact that these are criminal charges which must be proven beyond a reasonable doubt. Were we to look only at the State's evidence, as it demands, we could probably affirm. But our standard of review requires that we look at all of the evidence, and we must consider if there was a reasonable and substantial noncriminal explanation for the doctor's actions.

In the instant case, there is nothing close to a medical consensus that Dr. Naramore's actions were homicidal. In fact, there was extremely strong testimony to the contrary. This evidence included the testimony of two physicians who were involved in the treatment of the two alleged victims, although not in the actions which are the subject of this case. They testified that Dr. Naramore's actions were not only noncriminal, but they were medically appropriate.

There was also Dr. Cram's testimony that he confirmed Mr. Willt was actually dead, from a medical standpoint (although not technically "brain dead"), before resuscitation attempts were halted.

The evidence also included the testimony of three other highly qualified physicians who were asked to review the records and render their opinions on the reasonableness of Dr. Naramore's actions. They all found his actions were not only noncriminal, but were within the bounds of good medical practice.

Despite this testimony, the jury apparently found, *beyond a reasonable doubt,* that Dr. Naramore's actions were totally outside appropriate medical practice. Having found that, it then apparently found there was no reasonable doubt that the source of his actions was homicidal intent. They apparently arrived at this based on the testimony of the three physicians brought in by the State, who disagreed with the opinions of the other six physicians who testified.

We have made a thorough review of the record, which includes a wealth of undisputed evidence and expert medical testimony. We find that no rational jury could find criminal intent and guilt beyond a reasonable doubt based on the record here. When the issue is whether there is reasonable doubt, a jury is not free to disbelieve undisputed facts. What occurred here is generally known. The jury was not free to disbelieve that there was substantial competent medical opinion in support of the proposition that Dr. Naramore's actions were not only noncriminal, but were medically appropriate.

This is not a situation where the evidence in the defendant's favor is trifling. It is extremely strong. When there is such strong evidence supporting a reasonable, noncriminal explanation for the doctor's actions, it cannot be said that there is no reasonable doubt of criminal guilt. This is particularly true in a situation as we are faced with here, where the only way the defendant's actions may be found to be criminal is through expert testimony, and that testimony is strongly controverted in every detail.

We do not say that a physician can always escape criminal conviction for reckless or purposeful homicidal behavior through friendly medical testimony on his or her behalf. But there is a reason why there has yet to be in Anglo-American law an affirmed conviction of a physician for homicide arising out of medical treatment based on such highly controverted expert evidence as here.

All three *amicus* briefs acknowledge the appropriateness of criminal responsibility where a physician's actions are clearly reckless or purposefully homicidal. However, they note that if criminal responsibility can be assessed based solely on the opinions of a portion of the medical community which are strongly challenged by an opposing and authoritative medical consensus, we have criminalized malpractice, and even the possibility of malpractice.

The instant case is a very good example of this. With no direct evidence of criminal intent, it is highly disturbing that testimony by such an impressive array of apparently objective medical experts, who found the defendant's actions to be not only noncriminal, but medically appropriate, can be dismissed as "unbelievable" and not even capable of generating reasonable doubt.

The quality and quantity of evidence necessary to establish criminal guilt was not presented in this case. We must therefore reverse the convictions on the grounds of insufficient evidence and order the entry of a verdict of acquittal.

We wish to emphasize that we have considered the arguments and briefs concerning the request for change of venue, and the alleged jury misconduct and trial errors. The nearly 100 pages of briefs filed on these questions added greatly to our understanding of the case. However, because our ruling on the insufficiency of the evidence is dispositive of the case, we need not reach these other issues.

Reversed.

BRAZIL, C.J., dissenting: This case raises important issues concerning the possible criminal liability of a physician for providing medical services for his or her patients. Dr. Naramore was charged with and convicted of the attempted premeditated murder of Ruth Leach. He was also charged with the premeditated murder of Chris Willt and was convicted of this murder without premeditation. Although this case was tried as if it was a conventional murder/attempted murder case, it is uncontroverted that both charges arose out of actions taken by a physician in the care and treatment of his patients. The jury was instructed in both crimes that to find guilt it must find the crimes were committed intentionally and with mal-

ice. However, it was given no instruction on how to make this determination while taking into consideration the unique relationship and responsibility of a doctor to his or her patients while providing care. Aside from the testimony of the various doctors, the jury had little to guide it.

In holding that the jury's decision was not supported by sufficient evidence, the majority states that the jury was not free to disbelieve the undisputed medical testimony "in support of the proposition that Dr. Naramore's actions were not only noncriminal, but were medically appropriate." Although the jury was not instructed on the very difficult issues of palliative care and appropriate efforts toward resuscitation, the majority concludes that Dr. Naramore was convicted because the jury found that his actions were totally outside appropriate medical practice and that his actions stemmed from homicidal intent. The majority notes that such issues are not generally within the knowledge of a layperson and holds that if such issues arise in a case, the trial court should provide proper instruction.

This case adds a prospect of criminal liability to complex issues of health care for critically and terminally ill patients. Every day, doctors and other care givers must make difficult clinical decisions when dealing with critically ill patients. By letting the jury deliberate on these issues without further instruction or without providing some sort of screening mechanism, doctors are exposed to potential criminal liability for their actions related purely to their exercise of professional clinical judgment. As pointed out in the *amicus curiae* brief of the Kansas Medical Society, the possible imposition of criminal liability for such actions, taken within the bounds of professional responsibility, may have a chilling effect on the availability and quality of health care for the critically ill.

We have found no case from another jurisdiction where a physician has been charged with and convicted of homicide with a specific intent to kill for the exercise of professional judgment. Other jurisdictions have examined cases where a physician has been charged with reckless or negligent homicide. In those cases, the jury was required to find that the physician had committed a gross deviation from the reasonable standard of care or that the

physician's conduct was grievously unreasonable. See Annot., 45 A.L.R.3d 114, 121; 40 Am. Jur. 2d, Homicide § 99. We have found no case where a physician was convicted of homicide based on a single act of patient care which was not clearly a gross deviation from a standard of care.

In cases of medical malpractice, juries are instructed to find that the physician deviated from the standard of care of a reasonable physician. PIK Civ. 3d 123.01, 123.10. For a plaintiff to prevail in a medical malpractice case, juries are required to find through expert testimony the following three elements: "(1) that a duty was owed by the physician to the patient; (2) that the duty was breached; and (3) that a causal connection existed between the breached duty and the injury sustained by the patient." *Heany v. Nibbelink*, 23 Kan. App. 2d 583, Syl. ¶ 1, 932 P.2d 1046 (1997). The general standard of care for a doctor in the context of medical malpractice is well settled. It is that "[a] physician is obligated to his patient to use reasonable and ordinary care and diligence in the treatment of cases he undertakes, to use his best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other physicians in the same or similar locations." *Durflinger v. Artiles*, 234 Kan. 484, Syl. ¶ 3, 673 P.2d 86 (1983). In addition, statutes provide for the appointment of screening panels in medical malpractice cases, as well as for other professional malpractice cases. K.S.A. 60-3502; K.S.A. 65-4901. These panels consist of health care providers who decide whether there was a departure from the standard practice of the profession and whether a causal relationship existed between the damages suffered by the claimant and any such departure. K.S.A. 60-3504; K.S.A. 65-4903.

However, unlike the civil Pattern Jury Instructions provided in medical and professional malpractice cases, there are no criminal Pattern Jury Instructions relating to the medical and moral responsibilities of care givers for the critically or terminally ill patient, nor are there legislatively created screening panels. If care givers are now to be faced with the specter of criminal prosecution in these kinds of cases, then the legislature may want to consider

requiring the appointment of panels similar to those used for medical malpractice cases prior to the filing of criminal charges.

The medical profession has developed standards of palliative care for terminally ill cancer patients like Ruth Leach and for termination of resuscitation for patients like Chris Willt who suffer cardiac or respiratory arrest. Medical treatises abound dealing with the medical, moral, and ethical considerations involved in these cases. See, *e.g.*, Council Report, *Guidelines for the Appropriate Use of Do-Not-Resuscitate Orders*, 265 JAMA 1868, 1870 (April 10, 1991); Cherny & Catane, *Editorial: Professional Negligence in the Management of Cancer Pain*, 76 Cancer 2181 (1995). Certainly, in order to impose criminal liability in a situation where a physician is accused of specifically intending to kill a patient he or she is treating, a jury should be required to find an even more excessive deviation from the standard of care than in medical malpractice cases. At the very least, in the present case, the jury should have been instructed on the physician's duty and standard of care when treating a terminal cancer patient for pain and the recognized standard of care and measures to be taken in attempting to save a patient in Willt's condition. Since they were not so instructed, it is impossible to determine whether the jury made an assessment of Naramore's actions, taking into consideration his role as a physician.

However, because of the *amici* briefs filed in this appeal, the panel has had the opportunity to evaluate this case against a background of legal and moral considerations which was not readily available to the trial court and jury. As argued by the Kansas Medical Society, "due to the unique issues of patient care presented by this case of first impression, this is not an ordinary case where the appellate court should defer to the verdict of the factfinder." This is not a case in which criminal recklessness or negligence was alleged, nor is it a case in which it was alleged that the physician performed an assisted suicide. Dr. Naramore was charged with first- degree premeditated murder and attempted premeditated murder for exercising his professional clinical judgment. Dr. Naramore presented evidence in the form of medical testimony to show that he tried to save the life of Chris Willt and tried to ease

the pain of Ruth Leach, as he was ethically required to do as a responsible physician. And yet there were no instructions given to the jury on his defense.

"Instruction of the jury is one of the most fundamental duties of the court." *State v. Norris,* 10 Kan. App. 2d 397, Syl. ¶ 2, 699 P.2d 585 (1985).

"The purpose of instructing the jury is to guide the jurors in their deliberations and to aid them in arriving at a legally proper verdict. It is the trial judge's duty to explain to the jury the law of the case and to point out the elements necessary to be proved by the State in a criminal case." *State v. Cathey,* 241 Kan. 715, 730, 741 P.2d 738 (1987).

"In a criminal action, a trial court must instruct the jury on the law applicable to the theories of all parties where there is supporting evidence. The defendant is entitled to an instruction on his or her theory of the case even though the evidence is slight and supported only by defendant's own testimony. However, the trial court's duty to instruct arises only when there is sufficient supporting evidence from which a rational factfinder could find that the events occurred consistent with the defendant's theory." *State v. Rutter,* 252 Kan. 739, Syl. ¶ 2, 850 P.2d 899 (1993).

See also *State v. Shehan,* 242 Kan. 127, 130, 744 P.2d 824 (1987) (The court has a duty to instruct the jury on the law applicable to the theories of both the prosecution and the defendant.).

"Instructions which are erroneous and misleading can constitute grounds for a new trial." *State v. Cathey,* 241 Kan. at 730. If a party does not object to an instruction before the jury retires for deliberations, there is no ground for reversal unless the instruction was clearly erroneous. *State v. Isley,* 262 Kan. 281, Syl. ¶ 4, 936 P.2d 275 (1997). "The giving of an instruction is clearly erroneous only if the reviewing court reaches a firm conviction that absent the alleged error there was a real possibility the jury would have returned a different verdict." *State v. Jackson,* 262 Kan. 119, Syl. ¶ 3, 936 P.2d 761 (1997).

The court had a duty to instruct the jury on the law applicable to the case. The theory of the defense was that Dr. Naramore had no homicidal intent because he was performing his duty as a physician and making medically sound decisions. There was competent evidence introduced in support of this theory. There is a real possibility that had the jury been instructed on a doctor's responsibility

to make decisions concerning his or her patients, the jury would have returned a different verdict. In the present case, the jury should have been instructed on the medical standard of palliative care and termination of resuscitation.

The majority makes a strong argument for outright reversal of the jury's verdict based on insufficient evidence. I do not think we need to reach that issue. I would reverse and remand for a new trial with directions that the court properly instruct the jury.