[Cite as *Black v. Ohio Bd. of Nursing*, 2022-Ohio-4782.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Wesley B. Black, R.N., | : | |
| Appellant-Appellant, | : | |
| | | No. 22AP-218 |
| v. | : | (C.P.C. No. 20CV-5694) |
| Ohio Board of Nursing, | : | (REGULAR CALENDAR) |
| Appellee-Appellee. | : | |

D E C I S I O N

Rendered on December 29, 2022

**On brief:** *Dinsmore & Shohl, LLP, Daniel S. Zinsmaster,* and *Gregory A. Tapocsi*, for appellant. **Argued:** *Gregory A. Tapocsi.*

**On brief:** *Dave Yost,* Attorney General, and *Tracy M.Nave,* for appellee. **Argued:** *Tracy M. Nave.*

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Appellant, Wesley B. Black, appeals from the judgment of the Franklin County Court of Common Pleas affirming the order of appellee, the Ohio Board of Nursing ("Board"), that suspended Mr. Black's nursing license for statutory and regulatory infractions arising from the care of two terminally ill patients. For the reasons that follow, we affirm the judgment of the trial court.

## I. Factual and Procedural Background

{¶ 2} Mr. Black graduated from the Mount Carmel School of Nursing in February, 2017, with a Bachelor of Science degree in Nursing. (May 1, 2020 Hearing Examiner's Report and Recommendation, hereinafter, "R&R" at 15.) He obtained his licensure in March, 2017, and began working at Mount Carmel West Hospital the same month. *Id.* at

16. After completing Mount Carmel's orientation program, Mr. Black began working in its intensive care unit ("ICU"). *Id.*

{¶ 3} Patient I was a 75-year old female whose physician, suspecting heart failure, referred her to Mount Carmel West. *Id.* at 62. She was diagnosed with heart failure resulting from aortic stenosis and doctors determined that she needed an aortic valve replacement. *Id.* However, she began bleeding internally after the insertion of a stent and was transferred to the ICU due to a precipitous blood pressure drop. *Id.* In the ICU, Dr. Hagras diagnosed Patient I with hypercapenic respiratory failure, meaning that "her system was now failing to remove enough carbon dioxide from her blood." *Id.* She was intubated and prescribed "a continuous infusion" of both Midazolam and Fentanyl. *Id.* at 63.

{¶ 4} Over the next two days, Patient I's condition deteriorated as attempted treatment did not improve her blood oxygenation. *Id.* at 63-64. On the morning of November 18, 2018, Dr. Closser described her prognosis as poor, suggested consulting palliative care, and further noted: "She has severe valve disease and too ill to fix it. She needs this to improve. I don't think she's going to survive." *Id.* at 64.

{¶ 5} Jordan Blair was the nurse assigned to Patient I on the November 18, 2018 night shift. *Id.* He recalled that Dr. William Husel had decided that Patient I's treatment was "not as effective as he had hoped" and that "the time was rapidly approaching when the patient would have to be resuscitated, and that a discussion needed to occur" with her healthcare power-of-attorney about palliative withdrawal and changing her code status to Do Not Resuscitate/Comfort Care ("DNR/CC"). *Id.* at 64-65. After Patient I's power-of-attorney arrived, Mr. Blair, Dr. Husel, and a hospital spiritual adviser discussed trying to "make [the] patient as comfortable as possible." *Id.* at 65.

{¶ 6} At 12:53 a.m. on November 19, Dr. Husel changed Patient I's code status to DNR/CC, and immediately "ordered that Patient I be administered 1,000 mcg of Fentanyl and 10mg of Midazolam, both by bolus IV injection." *Id.* at 66. Mr. Blair obtained the medications from the Pyxis, the automated medication dispensing machine used at Mount Carmel West, and handed the medications to Mr. Black. Three minutes later, the hospital pharmacist rejected Dr. Husel's medication orders. *Id.* at 66. Mr. Black testified that he had seen "this happen a few times," and that Dr. Husel would then discuss the matter with

the pharmacist. *Id.* at 67. Although he did not recall seeing such a discussion that evening, records indicate that the pharmacist subsequently reversed the rejection. *Id.* at 69.

{¶ 7} Sometime between 1:00 and 1:30 a.m., Mr. Black administered the Fentanyl and Midazolam to Patient I, who was extubated and pronounced dead at 1:32. *Id.* at 69. Her death certificate listed "acute congestive heart failure due to severe aortic stenosis" as the immediate cause of death. *Id.* at 70.

{¶ 8} Patient J, an 82-year-old female, arrived at Mount Carmel West by ambulance complaining of shortness of breath. *Id.* at 71. After being diagnosed with pneumonia in both lungs and acute congestive heart failure, she was transferred to the ICU. *Id.* at 71-72. Her condition deteriorated and she was intubated at 8:13 p.m. on November 20, 2018. *Id.* at 72. Because Patient J was "agitated" and "fight[ing]" the ventilator, Dr. Husel ordered a 10 mg injection of the paralytic Vecuronium, which Mr. Black administered at 9:10 p.m. *Id.* Dr. Husel ordered a bolus dose of a second paralytic, Nimbex, which Mr. Black administered at 10:00 p.m. *Id.* at 73.

{¶ 9} Mr. Black testified that, in spite of the intubation, "Patient J was 'quickly decompensating' and was 'within minutes to hours of dying even on a ventilator and vasopressor support.' " *Id.* at 75, quoting Feb. 20, 2020 Tr. at 153. Dr. Husel discussed Patient J's condition with her family, who agreed to change the code status to DNR/CC and palliative extubation. *Id.* At 10:48 p.m., Patient J was removed from the ventilator. *Id.* at 76. At the same time, under Dr. Husel's orders, Mr. Black administered a 2,000 mcg dose of Fentanyl and a 10 mg dose of Midazolam by IV. *Id.* at 77. She died at 10:53 p.m., "five minutes after she had been administered the Fentanyl and Midazolam and extubated." *Id.*

{¶ 10} On March 14, 2019, the Board notified Mr. Black that it had initiated disciplinary proceedings against him under R.C. 4723.28, based on the following allegations:

> 1. While working as a nurse at Mount Carmel West in Columbus, Ohio, the following occurred:
>
> a. On or about November 19, 2018, you documented the administration of 1,000 mcg (10 - 100 mcg/2mL vials) of Fentanyl via IV Push at 01:26 and 10mg (5- 2mg/2mL vials) of Midazolam via IV Push at 01:27 to Patient [I]. These drugs were removed from the drug dispensing system (Pyxis) by another employee via override procedure. You administered these drug(s) despite the fact that you knew or should have

known that the order(s) were harmful or potentially harmful to the patient. You administered these drugs to the patient without documenting that you questioned the order(s) and/or consulted with any member of the health care team regarding the accuracy/validity of or harmfulness to the patient of these order(s).

b. On or about November 20, 2018, you administered the following to Patient [J]: (i) Vecuronium 10 mg via IV at 21:10; (ii) Nimbex Bolus (Cisatracurium) 3.5mL via IV at 22:01; and (iii) 2,000 mcg Fentanyl (20 - 100 mcg/2mL vials) via IV Push and 10 mg Midazolam (5- 2mg/2mL vials) via IV Push at 22:48 and 22:49 respectively. The patient's record contained no documentation as to the need for a paralytic. You administered these drug(s) despite the fact that you knew or should have known that the order(s) were harmful or potentially harmful to the patient. You administered these drugs to the patient without documenting that you questioned the order(s) and/or consulted with any member of the health care team regarding the accuracy/validity of or harmfulness to the patient of these order(s).

c. Regarding your administration of Vecuronium to Patient [J], as noted in Item 1.b, at 21:10, and Nimbex at 22:01, at 22:48 the physician's note states that the patient's endotracheal tube was removed. At this time, you documented assessments of the patient's vital signs/lack thereof. You did not document questioning the order to remove tube and/or consulting with any member of the health care team regarding the accuracy/validity of or harmfulness to the patient of the order to remove the tube relative to the time you administered the paralytic drugs to Patient [J].

(Mar. 14, 2019 Not. of Opportunity for Hearing ("NOH"))

{¶ 11} The NOH informed Mr. Black that, under R.C. 4723.28(B)(19), the Board was authorized to "discipline a licensee for failure to practice in accordance with acceptable and prevailing standards of safe nursing care." *Id.* It further noted that R.C. 4723.28(B)(16) authorized it "to discipline a licensee" for any violation of Ohio Revised Code Chapter 4723, the chapter regulating the nursing profession, "or any rules adopted under it." *Id.* Mr. Black had allegedly violated the standards set forth in four administrative rules. First, Mr. Black was alleged to have violated Ohio Adm.Code 4723-4-03(B), which states: "A registered nurse shall maintain current knowledge of the duties, responsibilities, and

accountabilities for safe nursing practice."  Second, the Board alleged that Mr. Black violated Ohio Adm.Code 4723-4-03(C), which states:

> A registered nurse shall demonstrate competence and accountability in all areas of practice in which the nurse is engaged including:
>
> (1) Consistent performance of all aspects of nursing care; and
>
> (2) Recognition, referral or consultation, and intervention, when a complication arises.

{¶ 12} Third, the Board alleged that Mr. Black violated Ohio Adm.Code 4723-4-03(E), which states:

> A registered nurse shall, in a timely manner:
>
> (1) Implement any order for a patient unless the registered nurse believes or should have reason to believe the order is:
>
> * * *
>
> (d) Harmful, or potentially harmful to a patient; or
>
> (e) Contraindicated by other documented information; and
>
> (2) Clarify any order for a patient when the registered nurse believes or should have reason to believe the order is:
>
> * * *
>
> (d) Harmful, or potentially harmful to a patient; or
>
> (e) Contraindicated by other documented information.[1]

{¶ 13} The final rule that the Board alleged Mr. Black violated was Ohio Admin. Code 4723-4-03(G), which states: "A registered nurse shall, in a timely manner, report to and consult as necessary with other nurses or other members of the health care team and make referrals as necessary."

{¶ 14} Mr. Black invoked his right to a hearing, which was held on February 24, 25, and 27, 2020.  The Board called as witnesses Mr. Black and another Mount Carmel Nurse,

---

[1] The NOH originally alleged all subparts of Ohio Adm.Code 4723-4-03(E) as grounds for discipline, but the Hearing Examiner concluded that the omitted portions "proved irrelevant under the facts presented."  (R&R at 7, fn.2.)

Jordan Blair, and introduced expert deposition and witness testimony from Sarah Blowers, CNP, and Daniel Fisher, RN, CRNN. Mr. Black also testified in his own defense, called several former Mount Carmel nurses as witnesses, and introduced the expert testimony of Brian P. Radesic, DNP, MSN, CRNA.

{¶ 15} On May 1, 2020, the Hearing Examiner issued a detailed 137-page Report & Recommendation, which stated that the following findings of fact had been established by a preponderance of the evidence:

> 1. The Respondent, Wesley B. Black, R.N., holds a license issued by the Ohio Board of Nursing ("Board") to practice as a Registered Nurse. He was first licensed to practice as a Registered Nurse by this Board on March 1, 2017
>
> 2. On or about November 19, 2018, at about 01:26 and/or 01:27 am, while working as a nurse at Mount Carmel Hospital West, in Columbus, Ohio, Mr. Black administered 1,000 mcg of Fentanyl and 10 mg of Midazolam, via IV push, to Patient I, as ordered by Dr. William Husel, in connection with a palliative extubation of Patient I.
>
> 3. Although Patient I was on a DNRCC protocol, the doses of Fentanyl and Midazolam ordered for Patient I by Dr. Husel were grossly in excess of any amounts of those medications that from an objective standpoint, could reasonably be considered as directed at the relief of the actual or anticipated pain or discomfort of Patient I.
>
> 4. The doses of Fentanyl and Midazolam administered to Patient I by Mr. Black each had a side effect of potential respiratory depression or arrest. Those two medications had a synergistic effect that multiplied the risk of respiratory depression or arrest, when administered together to Patient I.
>
> 5. Mr. Black both should have known, and should have had reason to believe, that the doses of Fentanyl and Midazolam ordered by Dr. Husel for Patient I were harmful or potentially harmful to the patient.
>
> 6. Mr. Black failed to question the order or consult with any other member of the health care team by communicating any concerns about the harmfulness or potential harmfulness to Patient I of Dr. Husel's order.
>
> 7. On November 20, 2018, Mr. Black administered Vecuronium and Nimbex, two paralytic agents, to Patient J. The last administration of a paralytic was Nimbex via IV push at 22:00 on November 20, 2018.

8. The State has failed to demonstrate, by a preponderance of evidence, that the orders to administer Vecuronium and Nimbex to Patient J, were harmful or potentially harmful to Patient J, as alleged at ¶ 1 (b) of the Notice.

9. At our about 22:48, on November 20, 2018, Mr. Black executed an order to palliatively extubate Patient J, by removing Patient's endotracheal tube, through which Patient J had been receiving respiratory support through a ventilator.

10. Mr. Black did not communicate to Dr. Husel or others on the health care team that the order to extubate Patient J should not be executed until Patient J had been tested for response to a Train of Four or by some other means to determine that the paralytics were no longer acting on Patient J's ability to respirate.

11. In extubating Patient J, and in all preparatory steps and omissions leading thereto, Mr. Black was acting within his licensure authority as a registered nurse under the direction of, and implementing an order of, the attending physician, Dr. Husel, pursuant to a DNRCC consent.

12. The extubation was undertaken by Mr. Black in good faith, with the intention of providing comfort care.

13. The extubation was, from an objective standpoint, a measure that could reasonably be considered as directed at the alleviation of pain and comfort of Patient J because an endotracheal tube is frequently uncomfortable, and because disconnecting the patient from life support devices, including a ventilator, is a necessary step in implementing a DNRCC protocol. The extubation was undertaken outside the longest period the evidence disclosed Nimbex to be known to remain active in the human body, albeit close to the outside limit.

14. The extubation was, therefore, within the apparent scope of the DNRCC consent.

15. On or about November 20, 2018, at about 22:48 and 22:49, while working as a nurse at Mount Carmel Hospital West, in Columbus, Ohio, Mr. Black administered 2,000 meg of Fentanyl and 10 mg of Midazolam, via IV push, to Patient J, as ordered by Dr. William Husel, in connection with a palliative extubation of Patient J.

16. Although Patient J was on a DNRCC protocol, the doses of Fentanyl and Midazolam ordered for Patient J by Dr. Husel were grossly in excess of any amounts of those medications that, from an objective standpoint, could reasonably have

been considered as directed at the relief of pain or discomfort for Patient J.

17. Those doses were also beyond the scope of the DNRCC consent, the effect of which is to authorize comfort care while permitting the patient to expire of natural causes.

18. The doses of Fentanyl and Midazolam administered to Patient J by Mr. Black each had a side effect of potential respiratory depression or arrest. Those two medications had a synergistic effect that multiplied the risk of respiratory depression or arrest, when administered together to Patient J.

19. Mr. Black both should have known, and should have had reason to believe, that the doses of Fentanyl and Midazolam ordered by Dr. Husel for Patient J were harmful or potentially harmful to the patient.

20. Mr. Black failed to question anyone about the order or consult with any other member of the health care team by communicating any concerns about the harmfulness or potential harmfulness to Patient J of Dr. Husel's order. Nor did he document having so questioned or consulted about the order.

(R&R at 122-26.)

{¶ 16} The Hearing Examiner's Report and Recommendations then set forth the following conclusions of law (its restatements of the governing statute and administrative rules omitted):

1. Despite the difference in language between the allegation that Mr. Black "knew or should have known" that orders were harmful or potentially harmful, in ¶¶ 1(a) and 1(b) of the Board's March 14, 2019, Notice, and the language of O.A.C. §§ 4723-04-03 (E)(l) and (E)(2), the Notice adequately put Mr. Black on notice that the Board was alleging violations of O.A.C. §§ 4723-04-03 (E) (I) and (E)(2), among the other statutes and rules listed in the Notice, and complied with O.R.C. § 119.07.

2. The March 14, 2019, Notice alleges, at ¶ 1 (b), that Patient J' s "record contained no documentation as to the need for a paralytic." The Board rule specifically applicable to Mr. Black's alleged failure to document the need to administer either of two paralytics to Patient J is O.A.C. § 4723-4-16(E), but that rule was not mentioned in the Notice - only a general rule that a nurse shall "demonstrate competence" and a general statutory provisions regarding "acceptable and prevailing standards of safe nursing care." It thus appeared

that the reference to lack of "documentation of the need for a paralytic" in ¶ 1(b) of the Notice was mere narrative supporting the allegation that Mr. Black administered the paralytics "despite the fact that you knew or should have known that the order(s) were harmful or potentially harmful," and was not intended to charge an independent violation of the Nursing Act or rules. To the extent that any party asserts that the allegation that "the record contained no documentation as to the need for a paralytic" was intended to allege an independent violation, I recommend that this allegation be dismissed.

3. Based on Findings of Fact, ¶ ¶ 7 and 8 , I recommend that the Board dismiss the allegations in ¶ 1(b) of the Notice that Mr. Black administered Vecuronium and Nimbex "despite the fact that you knew or should have known that the order(s) were harmful or potentially harmful to the patient" and that he "administered those drugs to the patient without documenting that you questioned the order(s) and/or consulted with any member of the health care team regarding the accuracy/validity of or harmfulness to the patient of these order(s)."

4. Based on Findings of Fact, ¶ ¶ 6 and 20, I recommend that the Board dismiss the allegations in ¶ ¶ 1(a) and 1(b) that Mr. Black failed to document having questioned the orders to administer Fentanyl and Midazolam to Patients I and J, or having consulted with any member of the health care team about them, for the reason that Mr. Black had no duty to document inquiries or consultations that never occurred.

5. The events described in Findings of Fact ¶ ¶ 1-5, and 15-19 above, relating to the administration of Fentanyl and Midazolam to Patients I and J, establish a basis for imposition of discipline by the Board pursuant to O.R.C. §§ 4723.28(B)(19) and (B)(16), and O.A.C. §§ 4723-4-03(B), (C)(l), and 4723-4-06(H).

6. The events described in Findings of Fact ¶ ¶ 1-6 and 15-20, above, relating to the failure to question, consult about or clarify the orders to administer Fentanyl and Midazolam to Patients I and J, establish a basis for the imposition of discipline by the Board pursuant to O.R.C. §§ 4723.28(B)(16) and (B)(19) and O.A.C. §§ 4723-4-03(C)(2), (E)(2)(d) and (G).

7. Mr. Black is not entitled to immunity pursuant to O.R.C. § 2133.11(A), for any professional disciplinary action the Board may take pursuant to Conclusions of Law, ¶ ¶ 14 and 15, above.

8. Mr. Black is entitled to immunity pursuant to O.R.C. § 2133.11(A)(6), from any consideration of the events referenced at Findings of Fact ¶ ¶ 9-14, relating to the timing of Mr. Black's removal of Patient J's endotracheal tube and his failure to question or consult about that order as alleged in ¶ 1-c of the Notice, but not including other steps preparatory to or consisting of the administration of Fentanyl or Midazolam to Patient J. The allegations contained in ¶ 1-c of the Notice cannot form the basis for professional disciplinary action, either as a violation of the Nursing Act and Rules, or as an aggravating circumstance or otherwise, to support or enhance any professional disciplinary action that may be taken against him. I therefore recommend that the charges contained in ¶ 1 (c) of the Notice be dismissed in their entirety.

(R&R at 127-30.)

{¶ 17} After weighing the aggravating and mitigating circumstances, the Hearing Examiner recommended that Mr. Black's nursing license be suspended for a minimum of one year, and, after reinstatement conditioned upon completion of a number of remedial courses, an additional stayed suspension of at least one year. *Id.* at 136.

{¶ 18} After considering the parties objections, the Board issued an order on October 21, 2020, accepting most of the Hearing Examiner's findings of fact and conclusions of law. The Board made the following exceptions:

1. The Board rejected Finding of Fact # 11. The rationale for the modification is that the Board agrees with the State's Objections, pages 9-10, and the State demonstrated by a preponderance of evidence that Mr. Black failed to consult with the health care team regarding the potential harmful effects of Nimbex prior to the removal of Patient [J]'s endotracheal tube.

2. The Board rejected Conclusion of Law #11. The rationale is that the Board agrees with the State's Objections, page 10, that the allegation that "the record contained no documentation as to the need for a paralytic" was intended as a factual statement, not as an alleged legal violation.

3. The Board rejected Conclusion of Law #12 in part, as follows and with the following rationale: the Board agrees with Conclusion #12 that Item l.b. of the Notice be dismissed as to Mr. Black's administering Vecuronium and Nimbex "despite the fact that [he] knew or should have known that the order(s) were harmful or potentially harmful to the patient". However, the remainder of Conclusion #12 is rejected in that

the State proved by a preponderance of evidence that the factual allegation, that Mr. Black "administered those drugs to the patient without documenting that [he] questioned the order(s) and/or consulted with any member of the health care team regarding the accuracy/validity of or harmfulness to the patient of these order(s)" is true and factually supported.

4. The Board rejected Conclusion of Law #13. The rationale is that the events described in Findings of Fact #6 and #20 establish a basis for imposing discipline pursuant to Sections 4723.28(B)(19), ORC; and 4723.28 (B)(16), ORC with respect to Rules 4723-4-03(B), (C), (E) and (G), and Rule 4723-4-06(H), OAC.

5. The Board rejected Conclusion of Law #17. The rationale is that Mr. Black is not entitled to immunity pursuant to Section 2133.11(A), ORC, for any professional disciplinary action the Board may take pursuant to Conclusion of Law #12, as modified by the Board. The Board disagrees with the Hearing Examiner's conclusion that Mr. Black is immunized in his conduct regarding Patient [J] as set forth in Item 1(c) of the Notice based on the legal rationale set forth in the State's Objections, pages 3-9. In adopting the State's legal interpretation of the Comfort Care statute, the Board particularly emphasizes that even when a nurse provides comfort care, the nurse must comply with accepted and prevailing standards of safe nursing care, which Mr. Black failed to do with Patients [I] and [J].

(Oct. 21, 2020 Order (hereinafter, "Order") at 1-2.)

{¶ 19} Having rejected portions of the Hearing Examiner's recommendations, the Board concluded that it had "fundamentally modified the basis upon which the Hearing Examiner's sanction was developed." *Id.* at 2. Thus, it modified the recommendation sanction as well. The Board ordered the suspension of Mr. Black's nursing license for an indefinite period, but for a minimum of one year, and, after reinstatement conditioned upon a number of educational and reporting requirements, an additional stayed suspension of at least three years with a number of temporary practice restrictions. *Id.* at 2-9.

{¶ 20} Mr. Black filed an appeal in the Franklin County Court of Common Pleas. He argued that the Board's order was not supported by reliable, probative, and substantial evidence, and that it was contrary to law for failing to apply the immunity from professional

discipline allowed by R.C. 2133.11 for a health care provider of comfort care.[2] The trial court affirmed the Board's order in its entirety.

{¶ 21} Mr. Black appeals from the trial court's judgment, and assigns the following as error:

> [I.] The Court of Common Pleas erred by not finding that Appellant is immune from professional disciplinary action under Section 2133.11 of the Ohio Revised Code with regard his administration of medications and treatments to two "Do Not Resuscitate-Comfort Care" patients pursuant to the direction of attending physician.

> [II.] The Court of Common Pleas erred in finding that the Order of the Ohio Board of Nursing was supported by reliable, probative and substantive evidence and was in accordance with law because the agency's findings are internally inconsistent

## II. Standard of Review

{¶ 22} R.C. 119.12(A) provides a right of appeal from an order "suspending a license" pursuant to an administrative proceeding. The Franklin County Court of Common Pleas has initial jurisdiction over appeals from such orders of the Ohio Board of Nursing. R.C. 119.12(A)(2)(d). "The court may affirm the order of the agency complained of in the appeal if it finds, upon consideration of the entire record and any additional evidence the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law." R.C. 119.12(H). If it does not affirm the order, the court "may reverse, vacate, or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law." *Id.*

{¶ 23} The review in the court of common pleas "is neither a trial de novo nor an appeal on questions of law only, but a hybrid review in which the court 'must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence, and the weight thereof.' " *Beach v. Ohio Bd. of Nursing*, 10th Dist. No. 10AP-940, 2011-Ohio-3451, ¶ 13, quoting *Lies v. Ohio Veterinary Med. Bd.*, 2 Ohio App.3d 204, 207 (1st Dist.1981) and *Andrews v. Bd. of Liquor Control*, 164 Ohio St. 275, 280 (1955). "The common pleas court must give due deference to the administrative agency's resolution of

---

[2] Mr. Black also raised a due process challenge that he has not subsequently raised on appeal.

evidentiary conflicts, but 'the findings of the agency are by no means conclusive.' " *Beach* at ¶ 13, quoting *Conrad* at 111. No such deference is afforded questions of law, however, which the common pleas court reviews de novo while "exercising its independent judgment" to determine if the order complies with R.C. 119.12(H)'s requirement that the order be in accordance with law. *Id.*

**{¶ 24}** Review by the court of appeals in a subsequent appeal "is even more limited than that of the trial court." *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). While the court of common pleas is tasked with reviewing the evidence, "this is not a function of the appellate court." Rather, the court of appeals must "determine only if the trial court has abused its discretion" when conducting its review. *Id.* "Absent an abuse of discretion on the part of the trial court, a court of appeals may not substitute its judgment for those of the medical board or a trial court." *Id.* Furthermore, "courts must accord due deference to the board's interpretation of the technical and ethical requirements of its profession." *Id.* "An appellate court, however, has plenary review of purely legal questions." *Beach* at ¶ 14, citing *Big Bob's, Inc. v. Ohio Liquor Control Comm.*, 151 Ohio App.3d 498, 10th Dist. No. 02AP-708, 2003-Ohio-418, ¶ 15.

## III. Analysis

**{¶ 25}** R.C. 4723.28(B) authorizes the Board to "deny, revoke, suspend, or place restrictions on any nursing license" if a nurse violates any one of a number of standards. Relevant here are R.C. 4723.28(B)(19), "[f]ailure to practice in accordance with acceptable and prevailing standards of safe nursing care," and R.C. 4723.28(B)(16), violating Chapter 4723 "or any rules adopted under it."

**{¶ 26}** In some situations, a nurse may be shielded from professional discipline for such violations. For example, Ohio's Modified Uniform Rights of the Terminally Ill Act provides immunity from "professional disciplinary action" for healthcare personnel in a set of specific circumstances related to end-of-life care. R.C. 2133.11(A). In relevant part, the statute states that:

> [A]n attending physician, consulting physician, health care facility, and health care personnel acting under the direction of an attending physician are not subject to criminal prosecution, are not liable in damages in a tort or other civil action, and are not subject to professional disciplinary action for any of the following:

&ast; &ast; &ast;

(5) Making determinations other than those described in division (B) of this section, or otherwise acting under this chapter, if the determinations or other actions are made in good faith and in accordance with reasonable medical standards;

(6) Prescribing, dispensing, administering, or causing to be administered any particular medical procedure, treatment, intervention, or other measure to a qualified patient or other patient, including, but not limited to, prescribing, personally furnishing, administering, or causing to be administered by judicious titration or in another manner any form of medication, for the purpose of diminishing the qualified patient's or other patient's pain or discomfort and not for the purpose of postponing or causing the qualified patient's or other patient's death, even though the medical procedure, treatment, intervention, or other measure may appear to hasten or increase the risk of the patient's death, if the attending physician so prescribing, dispensing, administering, or causing to be administered or the health care personnel acting under the direction of the attending physician so dispensing, administering, or causing to be administered are carrying out in good faith the responsibility to provide comfort care described in division (E)(1) of section 2133.12 of the Revised Code.

R.C. 2133.11(A).

{¶ 27} The relevant definition of "comfort care" under the Modified Uniform Rights of the Terminally Ill Act is any "medical or nursing procedure, treatment, intervention, or other measure that is taken to diminish the pain or discomfort of a declarant or other patient, but not to postpone the declarant's or other patient's death."[3] R.C. 2133.01(C)(3). The Act unequivocally states that nothing in it "condones, authorizes, or approves of mercy killing, assisted suicide, or euthanasia." R.C. 2133.12(D). Ohio law's comfort care provisions reflect the reality of "aggressive palliative care," which, "in some cases, painkilling drugs may hasten a patient's death, but the physician's purpose and intent is, or

---

[3] The definition of "comfort care" also includes "**(1)** [n]utrition when administered to diminish the pain or discomfort of a declarant or other patient, but not to postpone the declarant's or other patient's death" and "**(2)** [h]ydration when administered to diminish the pain or discomfort of a declarant or other patient, but not to postpone the declarant's or other patient's death." R.C. 2133.01(C).

may be, only to ease his patient's pain." *Vacco v. Quill*, 521 U.S. 793, 802 (1997). Such care may have "a 'double effect,' however, because in addition to relieving pain and suffering, the level of pain medication necessary to relieve pain may have the consequence of shortening life." *State v. Naramore*, 25 Kan.App.2d 302, 305, 965 P.2d 211 (1998). "Thus, the health care provider's role as healer conflicts with his or her role as reliever of suffering when increasing amounts of pain medication are required to provide comfort care, but these increasing doses may have the effect of slowing respirations and thereby hastening death." *Id.*

## A. First Assignment of Error

{¶ 28} Mr. Black's first assignment of error asserts that the trial court erred when ruling that he was not entitled to immunity from professional discipline under R.C. 2133.11 for the administration of medications to Patient I and Patient J. (Brief of Appellant at 22.) He argues that he satisfied the R.C. 2133.11(A)(6) requirements for immunity. *Id.* at 23-27. Mr. Black argues that the trial court erred by imposing an objective standard instead of a subjective one when considering his "purpose" under the statute, an interpretation that he believes is at odds with the legislative history of R.C. 2311.11(A). *Id.* at 28-31. He points to the language suggestive of an objective standard in R.C. 2133.11(A)(5), which applies to "determinations * * * made * * * in accordance with reasonable medical standards," and contrasts it with the language of R.C. 2133.11(A)(6) that applies to his claim of immunity, which does not reference a reasonable standard. *Id.* at 29. Mr. Black also asserts that the trial court erroneously applied the holding of *Gelesh v. State Med. Bd.*, 10th Dist. No. 10AP-169, 2010-Ohio-4378 ("*Gelesh II*") to his case, which he regards as distinguishable because it involved a "medication error."[4] *Id.* at 34. Both the Board and the trial court erroneously read *Gelesh II* to require an objective standard under R.C. 2133.11(A)(6) when deciding whether a health care practitioner administered medication for the "purpose of diminishing * * * pain," according to Mr. Black. *Id.* at 35-37. In addition, he asserts that the Board's Order "wrongfully inserted" an "additional element" into R.C. 2133.11(A)(6) by declaring that immunity could only apply if a nurse's actions "comply with accepted and prevailing

---

[4] *Gelesh II* is the second of two cases involving Dr. Gelesh. The first, *State ex rel. Gelesh v. State Med. Bd.*, 10th Dist. No. 06AP-1072, 2007-Ohio-3328 (*"Gelesh I"*) affirmed the dismissal of Dr. Gelesh's declaratory judgment action seeking to preempt the State Medical Board disciplinary proceeding by applying the immunity provisions of R.C. 2133.11(A) in the trial court.

standards of safe nursing care," as such language is absent from that statutory provision. *Id.* at 37-38.

{¶ 29} In response, the Board first argues that immunity under R.C. 2133.11(A) does not apply to a nurse who fails to practice in accordance with accepted and prevailing standards of safe nursing care, as a nurse must meet this standard "before they can claim immunity" under the statute. (Brief of Appellee at 21.) The Board interprets R.C. 2133.11 as imposing a three-pronged test for immunity to apply. *Id.* at 22. First, the nurse must qualify as health care personnel acting under the direction of an attending physician under R.C. 2133.11(A). *Id.* Second, the nurse's actions must be "in good faith and in accordance with reasonable medical standards" under R.C. 2133.11(A)(5). *Id.* Third, the provisions of 2133.11(A)(6) concerning the administration of "any form of medication, for the purpose of diminishing * * * pain or discomfort" while acting "in good faith" must be met. *Id.* The Board argues that Mr. Black's reading of R.C. 2133.11(A) would "completely abrogate[]" the "requirement that nurses practice in accordance with acceptable and prevailing standards of safe nursing care" under R.C. 4723.28(B)(19). *Id.* at 25. It also agrees with the trial court's application of *Gelesh II* and describes its holding as "controlling" in Mr. Black's case. *Id.* at 30. The Board reads *Gelesh II* to hold that "[n]ot even a good faith mistake excused the deviation from the standard of care."[5] *Id.* at 31.

{¶ 30} The parties' sole point of agreement is the relevancy of *Gelesh II* to this case, as it is the only appellate opinion to date interpreting any of the immunity provisions under R.C. 2133.11(A). In that case, Dr. Gelesh treated "a terminally ill 88-year-old patient" after she arrived "with severe abdominal pain" at the emergency room where he worked. *Gelesh II* at ¶ 2. The patient had previously executed a DNR/CC order. *Id.* The "increasingly large doses of morphine" the doctor administered did not alleviate her "extreme pain" as the night wore on. *Id.* Dr. Gelesh "conveyed a verbal order for a benzodiazepine" to the nurse, who heard the order incorrectly as Anectine, a "a neuromuscular blocking agent that paralyzes skeletal muscles including the respiratory muscles." *Id.* at ¶ 3. The nurse

---

[5] The Board also argues that immunity under R.C. 2133.11(A)(6) only applies to the administration of medication for purposes of comfort care and "does not grant blanket immunity" for any of the administrative rules Mr. Black violated. (Brief of Appellee at 33-35.) Because Mr. Black is not entitled to immunity under R.C. 2133.11(A)(6), we will not engage in an advisory discussion of the scope of its coverage in relation to the administrative rules.

retrieved the medication and consulted with other nurses about the order, who advised her against giving it to the patient, and then return to the patient's room. *Id.* at ¶ 4. "There was conflicting testimony: first, as to whether the nurse ever asked Dr. Gelesh if Anectine was the medication he wanted; and second, whether Dr. Gelesh heard the question and did not answer or whether he did not hear the question." *Id.* In any case, "Dr. Gelesh administered the drug himself without confirming what it was" and the patient "died within three minutes of receiving the medication." *Id.*

{¶ 31} Among other findings, the State Medical Board found that Dr. Gelesh's failure to "verify or confirm the medication Anectine before he administered it" violated R.C. 4731.22(B)(6), which authorizes disciplinary action for "[a] departure from, or the failure to conform to, minimal standards of care of similar practitioners under the same or similar circumstances, whether or not actual injury to a patient is established." *Id.* at ¶ 10. Dr. Gelesh invoked R.C. 2133.11(A)(6), arguing that immunity under that provision "is not forfeited when the physician makes a good-faith mistake." *Id.* at ¶ 49. We rejected the argument, reasoning as follows:

> Here, Dr. Gelesh was in good faith providing comfort care to an elderly woman on the verge of death, and therefore, Dr. Gelesh was entitled to immunity up to and including the time when he was administering increasing doses of narcotics and, in particular, morphine. However, the administration of [Anectine] cannot be considered comfort care. It was a medication error and not in accordance with minimal standards of care. Nor did the Patient 1's DNR/CC directive provide authority to administer [Anectine] under these circumstances, particularly with no respiratory support. We do not believe that R.C. Chapter 2133 provides immunity under these circumstances despite the fact that Dr. Gelesh acted in good faith with respect to his treatment of Patient 1 from the time she arrived in the emergency department until her death. The trial court did not abuse its discretion in so ruling.

*Id.* at ¶ 51

{¶ 32} Determining whether Dr. Gelesh was entitled to immunity under R.C. 2133.11(A)(6) required an application of both objective and subjective standards. The first question was whether the doctor had administered the medication "for the purpose of diminishing the qualified patient's or other patient's pain or discomfort and not for the

purpose of postponing or causing the qualified patient's or other patient's death, even though the medical procedure, treatment, intervention, or other measure may appear to hasten or increase the risk of the patient's death." R.C. 2133.11(A)(6). If Dr. Gelesh's subjective intent had been sufficient to demonstrate "purpose" under R.C. 2133.11(A)(6), he would have been entitled to immunity because there was no finding that he administered the Anectine with the actual purpose, or subjective intent, to hasten the patient's death. *Gelesh II* at ¶ 10. But Anectine could never have been administered with the objective purpose of diminishing pain or discomfort because the drug does not have that effect. *See Gelesh II* at ¶ 3 (stating that Anectine "is used to paralyze the respiratory muscles to facilitate endotracheal intubation. If the drug is administered without respiratory support, the patient ceases breathing and dies."). Morphine, however, did have a pain-relieving effect, so the objective purpose of its administration was recognized.

{¶ 33} After the determination is made whether the "purpose" of the act could objectively diminish the patient's pain or discomfort, the issue of subjective intent under R.C. 2133.11(A)(6) then arises because immunity only applies "if the attending physician * * * or the health care personnel acting under the direction of the attending physician * * * are carrying out in good faith the responsibility to provide comfort care * * *." Thus, Dr. Gelesh's subjective intent was only relevant to the administration of the drug that could be administered with the objective purpose of providing pain-relief.

{¶ 34} In Mr. Black's case, immunity under R.C. 2133.11(A)(6) depends on whether the administration of Fentanyl and Midazolam to Patient I and Patient J had the objective "purpose of diminishing * * * pain or discomfort and not for the purpose of postponing or causing * * * death, even though the * * * measure may appear to hasten or increase the risk of the patient's death." The Board adopted the Hearing Examiner's Finding of Facts #3 and #16, which found that for both patients, "the doses of Fentanyl and Midazolam ordered * * * by Dr. Husel were grossly in excess of any amounts of those medications that from an objective standpoint, could reasonably be considered as directed at the relief of the actual or anticipated pain or discomfort" of those patients. (R&R at 125; Order at 1.) Mr. Black administered those doses. Because the administration did not have the objective purpose

required by the statute, he is not entitled to immunity under R.C. 2133.11(A)(6). The inquiry ends there, and his subjective intent is irrelevant.[6]

{¶ 35} The recognition of an objective standard in *Gelesh II* does not depend on its observation that the medication administered was "not in accordance with minimal standards of care." *Gelesh II* at ¶ 51. The trial court read this language as integral to our holding in *Gelesh II*, stating that "*Gelesh II* certainly required consideration of the standard of care when evaluating immunity under [R.C.] 2133.11(A)(6). (Mar. 9, 2022 Decision at 27.) The Board similarly reads *Gelesh II* to have held that Dr. Gelesh did not qualify for immunity under R.C. 2133.11(A)(6) "because giving that medication was a medication error and as such was a departure from the minimum standard of care." (Brief of Appellee at 31.) But this language in *Gelesh II* referenced the basis for professional discipline under R.C. 4731.22(B)(6) that prompted the charge against Dr. Gelesh: "A departure from, or the failure to conform to, minimal standards of care of similar practitioners under the same or similar circumstances, whether or not actual injury to a patient is established." The readings of the trial court and the Board conflate the grounds for initiating discipline under R.C. 4731.22(B)(6) with the grounds for applying immunity under R.C 2133.11(A)(6). Only after proving the basis for discipline for "a departure from the minimum standard of care" does the question of immunity arise. R.C. 4731.22(B)(6).

{¶ 36} The Board engaged in the same circular reasoning when, in the section of the Order that rejected Conclusion of Law #17, it stated: "In adopting the State's legal interpretation of the Comfort Care statute, the Board particularly emphasizes that even when a nurse provides comfort care, the nurse must comply with accepted and prevailing standards of safe nursing care, which Mr. Black failed to do with Patients [I] and [J]." (Order at 2.) But Mr. Black's failure to comply with accepted and prevailing standards of care was what triggered the disciplinary process in the first instance under R.C. 4723.28(B)(19). Once the process began, the Board had to prove this charge. *Clayton v. Ohio Bd. of Nursing*, 10th Dist. No. 13AP-726, 2014-Ohio-2077, ¶ 45 (stating that "the Board had the burden of producing evidence and persuading the finder of fact that [the nurse] failed to provide nursing care to Patient 1 in accordance with the acceptable and

---

[6] This observation has no bearing on any other context involving Mr. Black's subjective intent or state of mind, such as the Hearing Examiner's consideration of witness credibility and the aggravating and mitigating circumstances. (*See* R&R at 80-85 & 131-37.)

prevailing standards of safe nursing care"). After proving its case, the question of immunity under R.C. 2133.11(A)(6) arose because that is an "affirmative defense" to the sanctionable conduct. *See Gelesh I*, 2007-Ohio-3328 at ¶ 12 (stating that "the Board clearly advocates that R.C. 2133.11 * * * provides an affirmative defense to the disciplinary sanctions authorized by R.C. 4731.22(A) and (B)"). The Board cannot reach back to the case it proved against Mr. Black and state that the affirmative defense fails because it met its burden of proof on an element of the original charge. To the extent the trial court endorsed this erroneous interpretation of the immunity requirement under R.C. 2133.11(A)(6), we clarify that such immunity cannot depend on the initial showing of a basis for discipline under R.C. 4723.28. No such requirement exists in the text of R.C. 2133.11(A)(6), and to impose would essentially nullify the immunity statute altogether. Nevertheless, this clarification does not affect the Board's basis for rejecting Conclusion of Law #17, in which the Hearing Examiner had recommended applying immunity under R.C. 2133.11(A)(6) to Mr. Black's "removal of Patient J's endotracheal tube and his failure to question or consult about that order," as the Board had found, based on its rejection of Finding of Fact #11, that Mr. Black was not acting within the scope of his authority when he implemented Dr. Husel's order to extubate Patient J.

**{¶ 37}** The Board also insists that the mention of "in good faith and in accordance with reasonable medical standards" in R.C. 2133.11(A)(5) requires an application of an objective standard in R.C. 2133.11(A)(6). (Brief of Appellee at 22.) *Gelesh II* did not rely on the mention of "reasonable medical standards" in 2133.11(A)(5), and we find reason to rely on that provision when recognizing the application of an objective standard. R.C. 2133.11(A)(5) defines a completely separate basis for immunity, yet the Board insists that the requirements of *both* subsections must be satisfied. *Id.* This interpretation is at odds with the plain language of R.C. 2133.11(A), which begins with a general clause identifying the types of actors that may be immune "for any of the following," and then lists separate grounds for immunity in six distinct subsections. The Board's interpretation rewrites "for any of the following" as "for all of the following," or "for at least two of the following." Courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997).

{¶ 38} Furthermore, the Board selectively quotes only the phrase "in good faith and in accordance with reasonable medical standards" in R.C. 2133.11(A)(5) when arguing that it should apply to *all* grounds for immunity listed in R.C. 2133.11(A). The basis for immunity described in R.C. 2133.11(A)(5) is: "Making determinations other than those described in division (B) of this section, or otherwise acting under this chapter, if the determinations or other actions are made in good faith and in accordance with reasonable medical standards." Whatever "determinations or other actions" this provision might apply to, it was simply not an asserted basis for immunity in Mr. Black's case.

{¶ 39} Furthermore, as Mr. Black points out, the General Assembly's 1994 amendment to the Modified Uniform Rights of the Terminally Ill Act added only R.C. 2133.11(A)(6) to the then-existing five grounds for immunity. 1993 Ohio H.B. 343. The General Assembly did not include the phrase "reasonable medical standards" in the amendment. We will not read it into R.C.2133.11(A)(6) ourselves because "a legislature 'is generally presumed to act intentionally and purposely when it includes particular language in one section of a statute but omits it in another.' " *In re in re Black Fork Wind Energy, L.L.C.,* 156 Ohio St.3d 181, 2018-Ohio-5206, ¶ 40, quoting *NACCO Industries, Inc. v. Tracy*, 79 Ohio St.3d 314, 316 (1997).

{¶ 40} Although the trial court erroneously adopted the Board's various interpretations of *Gelesh II* and R.C. 2133.11(A)(6), it did not err by recognizing the objective standard both required to determine immunity. When that standard is applied, Mr. Black is not entitled to immunity under R.C. 2133.11(A)(6) for any of the actions the Board sanctioned him for. Accordingly, the first assignment of error is overruled.

## B. Second Assignment of Error

{¶ 41} Mr. Black's second assignment of error asserts that the trial court erred by concluding that reliable, probative and substantial evidence supported the Board's order because its findings were internally inconsistent. (Brief of Appellant at 40.) He points to two examples from the Board's order in support of his argument.

{¶ 42} Mr. Black characterizes the Board's decision to reject the first part of the Hearing Examiner's conclusion of law number 12 while adopting the second part of it as inconsistent. *Id*. at 41-42. In conclusion of law 12, the Hearing examiner recommended that the Board dismiss the allegations stated in ¶ 1(B) of the NOH that Mr. Black had

administered Vecuronium and Nimbex "despite the fact that [he] knew or should have known that the order(s) were potentially harmful to the patient," and "without documenting that [he] questioned the order(s) and/or consulted with any member of the health care team regarding the accuracy/validity of or harmfulness to the patient of those order(s)." (R&R at 129.) The Board "agreed" with the recommendation to dismiss the allegation that Mr. Black had administered the drugs despite the fact that [he] knew or should have known that the order(s) were potentially harmful to the patient," but "rejected" the second part of the recommendation. (Order at 2.) The reason the Board gave was that the State had proven by a preponderance of the evidence that Mr. Black had administered Vecuronium and Nimbex without documenting that he had questioned the orders or consulted with anyone regarding their accuracy or harmfulness. *Id.* The allegation, the Board stated, "is true and factually supported." *Id.*

{¶ 43} Mr. Black argues that this reasoning is logically inconsistent because "the second allegation is dependent upon the first allegation being proven," and cites to the reasoning of the Hearing Examiner on this point. (Brief of Appellant at 41.) According to Mr. Black, it was "unreasonable" for the Board to conclude that "even though [he] did not know or have reason to know the medications were harmful, [he] should have nonetheless consulted with another member of the health care team about the harmfulness of the medications." *Id.* at 43-44. "It is implausible that a nurse would have a duty to consult with other healthcare professionals about the harmfulness of a medication if the nurse did not know or have reason to know that the medication was harmful in the first place." *Id.* at 44.

{¶ 44} In response, the Board argues that Mr. Black has waived this argument because he failed to raise it in the initial appeal before the trial court. (Brief of Appellee at 38.) Even if the argument were not waived, the Board argues, it is "without merit" because its ruling simply addressed two "separate acts. Indeed, the administration was justified but [Mr. Black's] failure to follow the basic nursing process was not." *Id.* at 39-40.

{¶ 45} Mr. Black disagrees that he has waived this argument, and counters that he "has repeatedly raised the Board's internally inconsistent findings and conclusions throughout the appellate process," citing his objections to the Hearing Examiner's R&R. (Reply at 16.) In support, he points to his assertion before the trial court that "the record contains no reliable, probative, or substantial evidence indicating that Mr. Black should

have known or had reason to believe that the medications were harmful or potentially harmful." *Id*. at 17.

{¶ 46} "A party generally waives the right to appeal issues that could have been raised, but were not raised, in earlier proceedings." *Hughes v. Ohio Bd. of Nursing*, 10th Dist. No. 15AP-786, 2016-Ohio-4768, ¶ 9. Somewhat confusingly, "the waiver doctrine actually applies when a party forfeits, not waives, an argument." *Edmands v. State Med. Bd. of Ohio*, 10th Dist. No. 14AP-778, 2015-Ohio-2658, ¶ 20 (rejecting appellant's argument that "he did not waive any arguments because he did not intentionally relinquish or abandon his right to raise those arguments before the Board"). "A forfeiture occurs when a party fails to preserve error by timely advising a tribunal of that error." *Id*., citing *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 23.

{¶ 47} Here, the record shows that Mr. Black failed to raise the inconsistency of the Board's order when adopting only the second part of Conclusions of Law # 12 as error. His arguments in response to the Board do not show that he properly raised the issue. First, he cites to the following statement in his objections to the Hearing Examiner's R&R: "The Hearing Examiner's analysis with regard to the Comfort Care Immunity Statute is internally inconsistent, contradictory of existing law, and in opposition to the testimony given at [the] Hearing." (Reply at 16, quoting June 22, 2020 Respondent's Objs. to Report and Recommendation.) But his argument now addresses the Board's partial adoption of conclusion of law 12 concerning the administration of Vecuronium and Nimbex, not the separate issue of immunity under R.C. 2133.11(A)(6). In addition, the portion of his objections he cites addresses the administration of Fentanyl and Midazolam, not the administration of the drugs addressed in Conclusion of Law # 12. Furthermore, and most crucially, Mr. Black's objections to the Hearing Examiner's R&R are irrelevant to the waiver issue because he made them before the Board's Order adopting Conclusion of Law # 12. The Order he claims is erroneous did not exist when he made the objections, so they cannot demonstrate that he preserved any alleged error they contain.

{¶ 48} The crucial question is whether Mr. Black asserted the alleged inconsistency in the partial adoption of Conclusion of Law # 12 before the trial court, the first tribunal that had the opportunity to address any error in the Board's Order. There, he gave "three reasons" why the Board's Order was "not supported by reliable, probative, or substantial

evidence." (Nov. 5, 2020 Appellant's Brief at 22.) The first two he has abandoned for purposes of this appeal. They concerned the allegedly biased nature of an investigator's report and testimony and the purported inconsistency between the orders issued by the Board in Mr. Black's case and that of another nurse facing discipline. *Id*. The third reason Mr. Black gave was that the Board's Order incorrectly applied "an improper *mens rea* standard" by interpreting "believes or should have reason to believe" under Ohio Admin. Code 4723-4-03(E) as imposing both an objective and subjective standard. *Id*. at 23-24.

{¶ 49} None of Mr. Black's arguments before the trial court mention the alleged inconsistency of the Board's Order when adopting the second portion of conclusion of law 12 while rejecting the first. Consequently, we conclude that Mr. Black waived his challenge to this ruling by not raising it before the trial court.

{¶ 50} Mr. Black makes the same argument of logical inconsistency concerning the Board's decision to reject Findings of Fact #11, which stated that during the extubation of Patient J, "Mr. Black was acting within his licensure authority as a registered nurse under the direction of, and implementing an order of, the attending physician, Dr. Husel, pursuant to a DNRCC consent." (R&R at 125.) The Board rejected this finding because it found that "the State [had] demonstrated by a preponderance of evidence that Mr. Black failed to consult with the health care team regarding the potential harmful effects of Nimbex prior to the removal of Patient [J]'s endotracheal tube." (Order at 1.) The reasoning of the Board is "grandly circular," Mr. Black argues, because "if the Board found that [he] did not know or have reason to know that administation of Nimbex was harmful or potentially harmful, how was he under a duty to consult with other professionals about its potential harmful effects?" (Brief of Appellant at 45.)

{¶ 51} We cannot answer the question because Mr. Black did not first ask it before the trial court. The irresolution resulting from application of the waiver doctrine is often unsatisfactory. But it is incumbent upon litigants to raise error in the first forum capable of addressing it. This is particularly true in administrative appeals to the court of common pleas, which has the statutory command to engage in "consideration of the entire record and any additional evidence the court has admitted" to resolve issues of inconsistency such as Mr. Black alleges. R.C. 119.12(M). *See also Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d

619, 621 (1993) (evidentiary review in administrative appeals "is not a function of the appellate court").

{¶ 52} Finally, Mr. Black alleges several inconsistencies in the trial court's findings. First, he argues that the trial court incorrectly stated that the Hearing Examiner had found no grounds for discipline under Adm.Code 4723-4-03(E) because the R&R had specifically identified such grounds in Conclusions of Law #15. (Brief of Appellant at 46-47.) It is true that the Hearing Examiner there stated: "The events * * * relating to the failure to question, consult about or clarify the orders to administer Fentanyl and Midazolam to Patients I and J, establish a basis for the imposition of discipline by the Board pursuant to O.R.C. §§ 4723.28(B)(16) and (B)(19) and O.A.C. §§ 4723-4-03(C)(2), (E)(2)(d) and (G)." (R&R at 129.) However, the error is immaterial. The trial court was quoting the Hearing Examiner's explanation to make the point that, whatever standard the administrative rule articulated, the ultimate grounds for discipline arose under R.C. 4723.28(B)(19). (Mar. 09, 2022 Decision at 19; R&R at 87 (stating that Adm.R. 4723-4-03(E)(l) and (E)(2) "do not explicitly state that a nurse *shall not* carry out a harmful or potentially harmful order. The commandment *not* to carry out a harmful or potentially harmful order, comes from O.R.C. § 4723.28(B)(19)").

{¶ 53} Second, Mr. Black faults the trial court for describing one of the acts he was disciplined for as the administration of "an incorrect dosage" of medication. (Brief of Appellant at 47.) He believes this characterization was an attempt to shoehorn the facts of his situation into the *Gelesh II* holding. *Id.* Although the dosages that he administered were exactly those prescribed by Dr. Husel and not "incorrect" under the facts of *Gelesh II*, they were objectively unreasonable for the reasons discussed. Thus, the trial court's description was not inconsistent in a way that prejudiced Mr. Black.

{¶ 54} Finally, Mr. Black is critical of the trial court for deferring to the Board's interpretation of R.C. 2133.11(A)(6), based upon the holding of *Hamilton Cty. Bd. of Mental Retardation & Dev. Disabilities v. Professionals Guild of Ohio*, 46 Ohio St.3d 147 (1989). (Appellant's Brief at 48.) In that case, an administrative decision was " entitled to deference by appellate courts" because it was " the product of administrative experience, appreciation of the complexities of the problem, realization of the statutory policies and responsible treatment of the facts." Our interpretation of R.C. 2133.11(A)(6) did not defer to that of that

of the Board and has been specifically critical of its arguments interpreting that statute and the trial court's deference to them.  We have nevertheless concluded that Mr. Black is not entitled to the immunity afforded by R.C. 2133.11(A)(6).  Thus, any interpretive deference the trial court engaged in did not ultimately affect the resolution of Mr. Black's case.  The second assignment of error is overruled.

{¶ 55} For the foregoing reasons, Mr. Black's assignments of error are overruled. Accordingly, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER, P.J, and SADLER, J., concur.

_____